# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

DENNIS HANSCOM, on behalf of himself
and all others similarly situated,

        Plaintiff,

    **vs.**

NORDSEC LTD, NORDSEC B.V.,
NORDVPN S.A., NORD SECURITY INC.,
and TEFINCOM S.A. d/b/a NORDVPN,

        Defendants.

**CASE NO. 3:24-CV-00277-KDB-DCK**

---

### DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION
### TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

Pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6), Defendants

NordSec Ltd, NordSec B.V., Nordvpn S.A., Nord Security Inc., and Tefincom S.A. move to dismiss

Plaintiff's amended complaint for lack of personal jurisdiction, lack of subject-matter jurisdiction,

and failure to state a claim upon which relief can be granted.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 3

    I.    Plaintiff Enrolled In And Paid For A Two-Year, Automatically Renewing Subscription To NordVPN And Related Services. ..................................................... 3

    II.   Nord Clearly And Conspicuously Disclosed Subscription, Renewal, Cancellation, and Refund Terms. .................................................................................................. 4

    III.   Plaintiff Canceled His Subscription, Was Not Charged For A Renewal Term, And Got A Full Refund Of His Initial Subscription Payment. ......................................... 6

    IV.   The Non-Contracting Defendants Have No Connection to Plaintiff's Claims. ........ 7

ARGUMENT .............................................................................................................. 8

    I.    The Court Should Dismiss All Counts For Lack Of Subject-Matter Jurisdiction. ... 8

    II.   The Court Should Dismiss All Counts For Failure To State A Claim.................... 11

        A.    Plaintiff Has No ARS Or UDTPA Claim Because He Has No Injury. ...... 11

        B.    Even If He Has Standing, Plaintiff Has Not Alleged An ARS Violation... 12

            (i)    Nord Clearly And Conspicuously Disclosed The Automatic Renewal Terms In Compliance With The ARS (Section (a)(1)). ... 12

            (ii)   Nord Adequately Disclosed Its Cancellation Terms...................... 14

        C.    Plaintiff Has Not Alleged A UDPTA Violation ......................................... 15

        D.    Plaintiff Fails To State Claims For Conversion Or Unjust Enrichment. .... 17

    III.   The Court Should Dismiss All Counts Against The Non-Contracting Defendants For Lack Of Personal Jurisdiction. ......................................................................... 19

        A.    There Is No General Jurisdiction Over Any Defendants. .......................... 20

        B.    There Is No Specific Jurisdiction Over The Non-Contracting Defendants. 20

            (i)    Plaintiff Has Alleged No Facts Establishing Purposeful Availment. ...................................................................................... 21

i

(ii)    Plaintiff's Claims Do Not Arise From Or Relate To The Non-Contracting Defendants' Contacts With North Carolina, If Any. .. 22

(iii)    Exercise Of Jurisdiction Would Be Unreasonable. ......................... 22

C.    Defendants Are Not Alter Egos Of Each Other. ......................................... 23

IV.    Amendment Would Be Futile. ................................................................... 25

CONCLUSION ................................................................................................................... 25

# TABLE OF AUTHORITIES

**CASES**

*Amirhamzeh v. Chase Bank USA, N.A.*,
No. CV 13-00527 BRO, 2013 WL 7219270 (C.D. Cal. Oct. 7, 2013) ................................... 10

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................................................... 11

*Belk, Inc. v. Meyer Corp., U.S.*,
679 F.3d 146 (4th Cir. 2012), *as amended* (May 9, 2012) ..................................................... 15

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................................................... 11

*Booe v. Shadrick*,
369 S.E.2d 554 (N.C. 1988) ................................................................................................ 19

*Burnett v. AT&T Inc.*,
No. 3:17-CV-741 (DJS), 2018 WL 11206383 (D. Conn. Mar. 16, 2018) ........................... 24

*Bush v. Nat'l Union Fire Ins. of Pittsburgh, PA*,
124 F. Supp. 3d 642 (E.D.N.C. 2015) .................................................................................. 8

*Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.*,
334 F.3d 390 (4th Cir. 2003) .............................................................................................. 19

*Church Ekklasia Sozo Inc. v. CVS Health Corp.*,
No. 3:20-cv-00382-RJC-DSC, 2022 WL 1572732 (W.D.N.C. Feb. 25, 2022) ..................... 24

*Ciccone v. Cavalry Portfolio Servs., LLC*,
2021 WL 5591725 (E.D.N.Y. Nov. 29, 2021) ........................................................................ 9

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ............................................................................................................. 8

*Consulting Eng'rs Corp. v. Geometric Ltd.*,
561 F.3d 273 (4th Cir. 2009) ......................................................................................... 20, 22

*Corcoran v. CVS Health Corp.*,
169 F. Supp. 3d 970 (N.D. Cal. 2016) ................................................................................. 24

*Daimler AG v. Bauman*,
571 U.S. 117 (2014) ........................................................................................................... 20

*Doe v. Obama*,
631 F.3d 157 (4th Cir. 2011) ................................................................................................ 9

*DP Envtl. Srvs., Inc. v. Bertlesen*,
834 F. Supp. 162 (M.D.N.C. 1993) ............................................................................ 22, 23, 24

*Drager v. PLIVA USA, Inc.*,
  741 F.3d 470 (4th Cir. 2014) .................................................................................25

*Dress v. Cap. One Bank (USA), N.A.*,
  No. 1:19-cv-00343, 2019 WL 3451304 (E.D. Va. July 30, 2019), *aff'd*, 849 F. App'x
  55 (4th Cir. 2021) .................................................................................................10

*DWM Int'l, Inc. v. Cristaux, Inc.*,
  No. 3:23-cv-00351, 2023 WL 8587271 (W.D.N.C. Dec. 11, 2023) (J. Bell) .........................19

*Epstein v. JPMorgan Chase & Co.*,
  No. 13 CIV. 4744 (KPF), 2014 WL 1133567 (S.D.N.Y. Mar. 21, 2014) ..............................10

*Evans v. B. F. Perkins Co.*,
  166 F.3d 642 (4th Cir. 1999) .......................................................................8, 14, 16

*Fidrych v. Marriott Int'l, Inc.*,
  952 F.3d 124 (4th Cir. 2020) .................................................................................22

*Figueroa v. Point Park Univ.*,
  553 F. Supp. 3d 259 (W.D. Pa. 2021) .........................................................................18

*Foodbuy, LLC v. Gregory Packaging, Inc.*,
  987 F.3d 102 (4th Cir. 2021) .................................................................................16

*Friedman v. Dollar Thrifty Auto. Grp., Inc.*,
  227 F. Supp. 3d 1192 (D. Colo. 2017) .........................................................................10

*Goines v. Valley Cmty. Servs. Bd.*,
  822 F.3d 159 (4th Cir. 2016) .............................................................................11, 16

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
  564 U.S. 915 (2011) ...........................................................................................20

*Grassy Creek Neighborhood All., Inc. v. City of Winston-Salem*,
  542 S.E.2d 296 (N.C. App. 2001) .............................................................................12

*Gray v. N. Carolina Ins. Underwriting Ass'n*,
  529 S.E.2d 676 (N.C. 2000) .............................................................................11, 12

*Gunn v. Minton*,
  568 U.S. 251 (2013) ...........................................................................................8

*IMO Indus., Inc. v. SEIM s.r.l.*,
  No. 3:05-cv-420-MU, 2006 WL 3780422 (W.D.N.C. Dec. 20, 2006) ....................................21

*In re Bulldog Trucking, Inc.*,
  147 F.3d 347 (4th Cir. 1998) .................................................................................8

*Int'l Shoe Co. v. State of Wash.*,
  326 U.S. 310 (1945) ...........................................................................................20

iv

*Jacobs v. Stein*,
  No. 3:16-cv-00768-MOC-DSC, 2017 WL 1017125 (W.D.N.C. Mar. 15, 2017)...................23

*JPMorgan Chase Bank, Nat'l Ass'n v. Browning*,
  750 S.E.2d 555 (N.C. App. 2013).....................................................................................19

*Kelly v. Georgia-Pac. LLC*,
  671 F. Supp. 2d 785 (E.D.N.C. 2009)...............................................................................17

*Krausz Indus. Ltd. v. Smith-Blair, Inc.*,
  188 F. Supp. 3d 545 (E.D.N.C. 2016)...............................................................................24

*Lianyungang FirstDart Tackle Co. v. DSM Dyneema B.V.*,
  871 F. Supp. 2d 482 (E.D.N.C. 2012)...............................................................................20

*Luman v. Theismann*,
  647 F. App'x 804 (9th Cir. 2016).......................................................................................10

*Manoula, LLC v. Ohio Sec. Ins.*,
  No. 1:21-cv-00718, 2022 WL 129322 (M.D.N.C. Jan. 13, 2022).........................................15

*McManus v. GMRI, Inc.*,
  No. 3:12-cv-009-DCK, 2012 WL 2577420 (W.D.N.C. July 3, 2012)...................................19

*Moody v. Charming Shoppes of Delaware, Inc.*,
  No. C 07-06073 MHP, 2008 WL 2128955 (N.D. Cal. May 20, 2008) ..................................24

*N. Carolina State Ports Auth. v. Lloyd A. Fry Roofing Co.*,
  240 S.E.2d 345 (N.C. 1978)......................................................................................17, 18

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
  591 F.3d 250 (4th Cir. 2009) .............................................................................................11

*Nguyen v. Stephens Inst.*,
  529 F. Supp. 3d 1047 (N.D. Cal. 2021) .............................................................................18

*Noble v. Hooters of Greenville (NC), LLC*,
  681 S.E.2d 448 (N.C. App. 2009).................................................................................11, 12

*Payoda, Inc. v. Photon Infotech, Inc.*,
  2015 WL 4593911 (N.D. Cal. July 30, 2015).....................................................................25

*Perkins v. New York Times Co.*,
  No. 22-cv-5202 (PKC), 2023 WL 3601489 (S.D.N.Y. May 23, 2023).......................... *passim*

*Saudi v. Northrop Grumman Corp.*,
  427 F.3d 271 (4th Cir. 2005) .............................................................................................23

*Severn Peanut Co. v. Indus. Fumigant Co.*,
  807 F.3d 88 (4th Cir. 2015) ...............................................................................................18

v

*Sneha Media & Ent., LLC v. Associated Broad. Co. P Ltd.*,
    911 F.3d 192 (4th Cir. 2018) ..................................................................21

*Stanford v. Home Depot USA, Inc.*,
    358 F. App'x 816 (9th Cir. 2009).............................................................9

*Taylor v. Fed. Aviation Admin.*,
    351 F. Supp. 3d 97 (D.D.C. 2018)..........................................................10

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021)................................................................................8, 9

*United States v. J & E Salvage Co.*,
    55 F.3d 985 (4th Cir. 1995)....................................................................18

*Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*,
    723 S.E.2d 744 (N.C 2012)....................................................................18

*Veney v. Wyche*,
    293 F.3d 726 (4th Cir. 2002) .................................................................11

*Viveros v. Audible, Inc.*,
    No. C23-cv-0925-JLR, 2023 WL 6960281 (W.D. Wash. Oct. 20, 2023) ..............12

*Waddell v. U.S. Bank Nat'l Ass'n*,
    395 F. Supp. 3d 676 (E.D.N.C. 2019)....................................................15

*White by & through White v. Aetna Life Ins.*,
    519 F. Supp. 3d 253 (W.D.N.C. 2021) ..................................................22

*Wooton v. CL, LLC*,
    No. 2:09-CV-34-FL, 2010 WL 3767308 (E.D.N.C. Sept. 27, 2010), aff'd, 504 F.
    App'x 220 (4th Cir. 2013) ......................................................................18

**STATUTES**

N.C. Gen. Stat. § 75–16 ..................................................................................11

N.C. Gen. Stat. § 75-1.1 ...................................................................................1

N.C. Gen. Stat. § 75-41 ...........................................................................*passim*

**RULES**

Fed. R. Civ. P. 9(b) .........................................................................................15

Fed. R. Civ P. 12(b)(6)......................................................................................1

**OTHER AUTHORITIES**

U.S. Const. amend. XIV ..................................................................................19

U.S. Const. art. III ........................................................................................................8, 9

Case 3:24-cv-00277-KDB-DCK   Document 55   Filed 08/21/24   Page 8 of 35

# INTRODUCTION

In his original putative class action complaint, Plaintiff Dennis Hanscom alleged that Nordvpn S.A. ("Nord") and its affiliates violated North Carolina's auto-renewal statute (N.C. Gen. Stat. § 75-41) ("ARS") by failing to provide compliant auto-renewal disclosures when he purchased Nord's online subscription services. On the same basis, he asserted claims under North Carolina's Unfair and Deceptive Trade Practices Act (N.C. Gen. Stat. § 75-1.1) ("UDTPA") and various tort theories. Because Plaintiff admitted that he had successfully canceled his subscription and never paid for a renewal term, he had suffered no cognizable harm under the ARS and UDTPA. Defendants therefore moved to dismiss on grounds that Plaintiff lacked any injury or standing. Defendants also moved to dismiss certain claims under Rule 12(b)(6), in part because Nord's disclosures *were* ARS compliant. And they moved to dismiss all claims against certain defendants for lack of personal jurisdiction. Rather than respond, Plaintiff amended his complaint.

The amended complaint is worse than the original, particularly as to standing. In addition to his original admission that Nord never charged him for a subscription *renewal*, Plaintiff now admits that *six months* before he brought suit, Nord also refunded his *initial* subscription fee. Combined, these admissions deprive Plaintiff of standing under even the most generous interpretation of his claims. The Court has no subject matter jurisdiction over Plaintiff's first cause of action, for an ARS violation, because the ARS deals with auto-renewal-based injuries only. The same holds for Plaintiff's UDTPA and tort law claims, which also depend on the ARS allegations.[1] But even if the Court treats the non-ARS claims as *un*related to auto-renewal, Plaintiff's refund admission deprives him of standing anyway: Plaintiff has suffered no concrete harm, because his

---

[1] Plaintiff has (wisely) dropped his negligent misrepresentation claim.

subscription cost him nothing.[2]

Nor do Plaintiff's amended allegations save his claims from dismissal for failure to state a claim. First, Nord's disclosures were ARS compliant, as is evident from the allegations and evidence subject to judicial notice. Second, even with his shift in focus to Nord's allegedly deceptive "trial period" offer and refund practices, Plaintiff still fails to state a claim for deceptive conduct under the UDTPA. In fact, screenshots of Nord's subscription checkout pages pasted into the original and amended complaints show clearly that Plaintiff knowingly purchased a subscription with an initial two-year term. They say nothing about a "trial period" with which, Plaintiff now alleges, Nord tricked him into a paid subscription. Even the *new* screenshots that Plaintiff has added say nothing about a "trial period." They show only that paid subscriptions came with a limited-time money-back guaranty.

Plaintiff alleges that Nord did not immediately refund the price of his initial subscription when he canceled within 30 days of enrollment. But as Nord disclosed, cancellation of renewing subscriptions and refunds are different. When a subscriber *cancels* the subscription, Nord cancels the *renewal* period but not the ongoing term and access to services for which the subscriber has already paid. To get a *refund*, a subscriber must not only cancel the renewing subscription, but must ask for a refund within the first 30 days. Plaintiff admits that Nord discloses the distinction, and he does *not* allege that he asked for a refund. In an attempt to save the claim, therefore, he alleges that Nord buries the information in "fine print." In fact, as demonstrated below in (regrettably exhaustive) detail, Nord plasters the difference between the renewal and initial terms, and the

---

[2] This case should not get to class certification, but, if it did, Plaintiff could never represent a class of consumers who could at least *allege* injury based on having *actually* paid for auto-renewed—or, indeed, even *initial*—subscription periods.

processes for cancellation and refunds, all over the terms of service and subscription terms to which Plaintiff agreed. And in all events, despite not owing him a refund, Nord gave him one. Thus, even if Plaintiff had standing, the Court should dismiss because Plaintiff fails to state a claim.

Additionally, NordSec Ltd, NordSec B.V., Nord Security Inc., and Tefincom S.A. (the "Non-Contracting Defendants") have no connection to this forum or to Plaintiff's claims. The Court should dismiss all claims against them for lack of personal jurisdiction.

## STATEMENT OF FACTS

**I.  Plaintiff Enrolled In And Paid For A Two-Year, Automatically Renewing Subscription To NordVPN And Related Services.**

Plaintiff alleges that he signed up for a "30-day trial period." Dkt. 50, Amended Class Action Complaint ("Am. Compl."). But as the screenshots in both the original complaint and amended complaint show, Plaintiff in fact purchased a two-year plan for NordVPN, NordLocker, and NordPass on August 2, 2023. *Id*. ¶ 53. That plan would automatically renew unless Plaintiff cancelled. *Id*. As he alleges, during the sign-up process, Plaintiff reached a checkout page that offered a "2-year plan" for a "Total" price of "$111.41*" for the *initial* term. *Id*.[3] The asterisk referred Plaintiff to the following auto-renewal terms, which provided that his plan would renew for one year after the initial two-year period:

> The introductory price is valid for the first term of your subscription. Then it will be automatically renewed for an additional 1-year term annually and you'll be charged the then-applicable renewal price. Savings granted by the introductory price are compared to the current renewal price, which is subject to change. But don't worry — we'll always send you a notification email prior to charging. Learn more

*Id.* To complete the transaction, Plaintiff had to take affirmative action, including inputting his

---

[3] The screenshots in Plaintiff's amended complaint (Am. Compl. ¶ 53) show a total price of $111.41 for a two-year subscription for NordVPN, but Plaintiff later alleges that he paid $131.76 for a two-year subscription for NordVPN, NordLocker, and NordPass (*id*. ¶¶ 79).

email address, *payment* information, and then clicking the "Continue" button.  *Id.*  When Plaintiff

entered his email address, he was presented with a disclosure stating that "[b]y submitting your

information and continuing to purchase, you agree to our <u>terms of service</u> and <u>privacy policy</u>."  *Id.*

And when he selected a payment method, he was *again* presented with a link to the terms of service

and *another* disclosure, right above the "Continue" button, stating that "*[s]ervices are subscription*

*based and will automatically renew until you cancel.  See subscription and cancellations <u>terms</u>*."

*Id.* ¶ 59 (italicized emphasis added); *see also* RJN Exhibit[4] 1 (Terms of Service);[5] Am. Compl. ¶ 64

(explicitly incorporating "then-most recent version of Nord Security's 'terms of service'").[6]

Plaintiff admits that he instantly received a receipt thanking him for his "purchase" and

showing the payment for a two-year subscription to NordVPN and related services, that he

"downloaded the NordVPN app," and that he "accessed his Nord Security offerings a few times

during the [alleged] trial period."  *Id.* ¶¶ 67, 79.

## II.   Nord Clearly And Conspicuously Disclosed Subscription, Renewal, Cancellation, and Refund Terms.

In the "Introduction" to the agreed terms of service, Nord explains that:

> All our paid Services are provided on a Subscription basis.  *This means that the provision of the Services will auto-renew at the end of the current Subscription period, unless you cancel it before the auto-renewal.*  For a summary of key aspects related to your Subscription of our Services, please read the **Subscription Terms**.

RJN Exhibit 1 ¶ 1.2 (italicized emphasis added).  The terms of service further disclose the auto-

---

[4] Citations to "RJN Exhibit" refer to Defendants' concurrently filed request for judicial notice and the exhibits attached to the declaration of Samuel Sahagian in support of Defendants' request for judicial notice.

[5] https://my.nordaccount.com/legal/terms-of-service/ [https://archive.fo/8nx4S]

[6] The agreed terms of service govern Plaintiff's "use of and access to the [services], and any Software … provided by Nord."  RJN Exhibit 1 ¶ 1.1.  Under the terms of service, Nord was the provider for the services Plaintiff purchased.  RJN Exhibit 1 ¶ 1.4 (under the terms of service, "Nord," "we," "us," or "our" mean "nordvpn S.A.").

renewal and cancellation terms in the "**Subscription and Auto-Renewals**," "**Prices and Payments**" and "**Cancellation and Refund Policy**" sections, emphasizing that subscribers may cancel auto-renewal at any time, and that "canceled Subscriptions will *not* be refunded *for the unused part of the ongoing Service period*":

> **3.1. Subscription.** All our paid Services are provided on a Subscription basis …. Please review **Subscription Terms** for more information.
>
> **3.2. Auto-Renewal.** After the end of your Service period, your subscription will automatically renew … *unless you decide to cancel the Subscription renewal before the day of the charge.* If you do not cancel the Subscription in such due course, your chosen payment method will be charged the then-current renewal price for the upcoming defined Service period. […]
>
> **5.3 Recurring Payments.** When you purchase the Services on a Subscription basis (e.g., monthly, annually, or otherwise), *you agree that (i) Services will auto-renew until you cancel it, (ii) you are authorizing recurring payments* … For more information about the Subscription and its cancellation please read our **Subscription terms**. […]
>
> **6.1 Subscription Cancellation.** You have a right to cancel your Subscription (i.e., *turn off auto-renewals for the upcoming Service period*) at any time (please note that *canceled Subscriptions will not be refunded for the unused part of the ongoing Service period*). […]
>
> **6.7 Canceling the Auto-Renewal of the Subscription Purchased on our Websites.** If you have purchased an automatically renewing Subscription on our Websites and would like to stop it from automatically renewing, you can do so at any time from your Nord Account. *Canceled Subscriptions will not be refunded for the unused part of the ongoing Service period.*

*Id.* ¶¶ 3.1, 3.2, 5.3, 6.1, 6.7 (italicized emphases added).

The hyperlinked "**Subscription Terms**" in paragraphs 1.2, 3.1, and 5.3 of the terms of service *also* disclose the renewal and cancellation terms:

> After the end of your initial plan, *your subscription will be automatically renewed, and you will be charged the then-current price of the service.* For more information, read our **Terms of Services**. […]
>
> *You can cancel a recurring subscription at any time from your Nord account*, iTunes/App Store, or Google Play Store. *Canceled accounts will not be refunded*

*for the unused part of the ongoing service period.*  For further information about the cancellation policy, read our **Terms of Services**.

RJN Exhibit 2 (italicized emphasis added).[7]  Users may also contact customer support for any request related to their subscription services, including to cancel their subscription or to obtain a refund.  RJN Exhibit 1 ¶ 18.8.  That is, indeed, what Plaintiff did when he cancelled.  Am. Compl. ¶¶ 81-82.

Nord also disclosed how a subscriber could get a *refund*: "**6.2 Refund.**  We seek your full satisfaction with our Services.  However, if you are not satisfied with our Services, you may cancel the Subscription *and request a refund within thirty (30) days following your purchase of our Services* ("Money Back Guarantee").  RJN Exhibit 1 ¶ 6.2-6.3 (italicized emphasis added); *see also id*. ¶ 6.4 (Eligibility For Refund).  Thus, to get a refund, a customer had to request it within the first 30 days of the subscription.

III.  **Plaintiff Canceled His Subscription, Was Not Charged For A Renewal Term, And Got A Full Refund Of His Initial Subscription Payment.**

On August 15, 2023, Plaintiff contacted customer support to cancel his subscription.  Am. Compl. ¶¶ 81-82.  Customer support immediately complied and "informed [him] that he would not be charged [again] unless he resubscribed."  *Id*. ¶ 81.  Later that day, Plaintiff "received an email … advising that the automatic renewal feature of his subscription had been cancelled," (*id*. ¶ 82) precisely as described in the terms of service and subscription terms quoted above, and to which Plaintiff affirmatively agreed.  Plaintiff was thus never charged for a renewal term, and he does not allege otherwise.  Nor does he allege that he ever asked for a refund within 30 days of enrollment.  Nevertheless, on September 28, 2024—44 days after he enrolled—Nord refunded the entire $131.76 that Plaintiff paid for his two-year subscription (*id*. ¶ 87), though it had no obligation to even refund

---

[7] https://my.nordaccount.com/legal/terms-of-service/subscription/ [https://archive.fo/nSxlg]

the "unused part" of that initial term (RJN Exhibit 1 ¶ 6.1, 6.7). Plaintiff did not sue Nord until six months *after* the refund. He did not acknowledge the refund in his original complaint. *See* Dkt. 1.

## IV.    The Non-Contracting Defendants Have No Connection to Plaintiff's Claims.

The Non-Contracting Defendants did not participate in the alleged conduct giving rise to this lawsuit. Declaration of Olga Sinkeviciene ("Sinkeviciene Decl.") ¶ 3; Declaration of Ruta Gorelcionkiene ("Gorelcionkiene Decl.") ¶ 3; Declaration of Geraldas Kasulis ("Kasulis Decl.") ¶ 3; Declaration of Alina Gatsaniuk ("Gatsaniuk Decl.") ¶ 3. They did not sign Plaintiff up for any services, and they did not charge Plaintiff for or provide the services at issue. *Id*. At the time of and before the alleged conduct, the Non-Contracting Defendants had no employees or contractors in North Carolina. Sinkeviciene Decl. ¶ 9; Gorelcionkiene Decl. ¶ 9; Kasulis Decl. ¶ 9; Gatsaniuk Decl. ¶ 9. They have no offices or property in North Carolina, and they do not ship products into North Carolina, or market or advertise retail consumer services there. Sinkeviciene Decl. ¶¶ 9-14; Gorelcionkiene Decl. ¶¶ 9-14; Kasulis Decl. ¶¶ 9-11; Gatsaniuk Decl. ¶¶ 9-11.

NordSec Ltd, a holding company organized under the laws of England & Wales with its principal place of business is in London, England, once owned the intellectual property of the Nord brand. Sinkeviciene Decl. ¶ 3. NordSec B.V., a holding company organized under the laws of the Netherlands with its principal place of business in Amsterdam, the Netherlands, currently owns the intellectual property related to the brand. Gorelcionkiene Decl. ¶ 3. Nord Security Inc., a Delaware corporation with its principal place of business in Lewes, Delaware, sells and provides business-to-business services, but not retail consumer services. Kasulis Decl. ¶ 3. Tefincom S.A., a Panama corporation with its principal place of business in Panama City, Panama, was the contracting entity for retail consumer VPN services purchased on or before November 15, 2020, only. Gatsaniuk

7

Decl. ¶ 3.[8]  Defendants keep their own finances, hold their own board meetings, have their own corporate records, and generally do not share officers and directors.  Declaration of Jurgita Baltramiejuniene ("Baltramiejuniene Decl.") ¶¶ 4-8; Sinkeviciene Decl. ¶¶ 4-8; Gorelcionkiene Decl. ¶¶ 4-8; Kasulis Decl. ¶¶ 4-8; Gatsaniuk Decl. ¶¶ 4-8.

## ARGUMENT

**I.    The Court Should Dismiss All Counts For Lack Of Subject-Matter Jurisdiction.**

"[F]ederal courts are courts of limited jurisdiction, constrained to exercise only the authority conferred by Article III of the Constitution and affirmatively granted by federal statute."  *In re Bulldog Trucking, Inc.*, 147 F.3d 347, 352 (4th Cir. 1998); *see Gunn v. Minton*, 568 U.S. 251, 256 (2013).  Plaintiffs bear the burden of proving that jurisdiction exists.  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 430–31 (2021); *see also Evans v. B. F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999).  For each asserted claim, "a plaintiff must show that: (1) he has suffered an injury-in-fact; (2) the injury is fairly traceable to the challenged action of defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Bush v. Nat'l Union Fire Ins. of Pittsburgh, PA*, 124 F. Supp. 3d 642, 651 (E.D.N.C. 2015) (citing *Friends of the Earth, Inc. v. Laidlaw Env't Servs.*, 528 U.S. 167, 180–81 (2000)).  "[A]ny injury in fact must be fairly traceable to" the legal violation asserted.  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411 (2013).

In addition, because an "injury in law is not an injury in fact," plaintiffs suing in federal court under consumer-protection statutes must demonstrate "concrete harm," not merely a technical violation of the law, arising from the defendant's conduct.  *TransUnion LLC*, 594 U.S. at 413, 422–430.  Traditionally recognized "concrete harms" include physical harm, monetary harm,

---

[8] Tefincom might still be the contracting entity for contracts entered into on or before that date, but Tefincom S.A. did not offer new contracts or consumer VPN services after November 15, 2020, including in 2023.  Gatsaniuk Decl. ¶ 3.

reputational harm, disclosure of private information, and intrusion upon seclusion. *Id.* Thus, in *TransUnion*, the Supreme Court held that 6,332 class members who brought claims for technical violations of the Fair Credit Reporting Act, but whose credit reports were not disclosed to third parties, lacked Article III standing. *Id.* at 422–430. "[T]he *TransUnion* decision substantially and materially changed a district court's analysis of Article III standing in statutory consumer law cases." *Ciccone v. Cavalry Portfolio Servs., LLC*, 2021 WL 5591725, at *3 (E.D.N.Y. Nov. 29, 2021). Unless Plaintiff can allege that he has been personally harmed in a legally cognizable way, he cannot proceed with *any* claim, individually or on behalf of a class. *TransUnion LLC*, 594 U.S. at 442 ("No concrete harm, no standing."); *see also Doe v. Obama, 631 F.3d 157, 160 (4th Cir. 2011)* ("The Supreme Court has made clear that named plaintiffs who represent a class must allege and show that they personally have been injured …" (internal marks omitted)).

By his own admission, Plaintiff has suffered no concrete harm under the ARS or otherwise. The ARS applies only when there is injury associated with a service's *autorenewal*. *See* N.C. Gen. Stat. § 75-41(a) (imposing disclosure obligations on those providing contracts that "renew[] unless the consumer cancels the contract."); *id.* § 75-41(e) (violation of the ARS "renders the automatic renewal clause void and unenforceable."). Plaintiff admits that his one payment to Nord, of $131.76, was for an initial two-year subscription term, and that he canceled his subscription before it renewed. Am. Compl. ¶¶ 53, 67, 81-82. Because Nord never charged him for a renewal term, Plaintiff suffered no harm under the ARS. To the extent that Plaintiff's UDTPA and tort claims depend on his ARS allegations, the lack of a renewal charge deprives Plaintiff of standing for those claims as well. But he lacks standing for the non-ARS claims for the separate reason that, as he now admits, Nord refunded his entire initial subscription fee *six months* before he filed suit (and just over a month after enrollment). *Id.* ¶ 87. Thus, Plaintiff cannot allege a justiciable "concrete

harm" under any of his theories. *Transunion, LLC*, 594 U.S. at 442; *see, e.g.*, *Stanford v. Home Depot USA, Inc.*, 358 F. App'x 816, 819 (9th Cir. 2009) (no harm where plaintiff sued two months after receiving refund); *Luman v. Theismann*, 647 F. App'x 804, 807 (9th Cir. 2016) (similar).

Plaintiff failed to acknowledge the refund in his original complaint. Indeed, he relied on the (refunded) initial purchase price as a measure of harm. Dkt. 1, Compl. ¶ 69. Perhaps attempting to sweep that omission under the rug—and surely aware that the refund deprives him of standing—Plaintiff now alleges that he was "damaged by the lost time value of his funds between August 15, 2023, and September 28, 2023." Am. Compl. ¶ 91. But "[w]here a plaintiff raises an injury in fact argument premised solely on the lost time value of money, conclusory allegations that the plaintiff was deprived of the use of those funds … are not sufficient to establish injury in fact even at the motion to dismiss stage." *Dress v. Cap. One Bank (USA), N.A.*, No. 1:19-cv-00343, 2019 WL 3451304, at *3 (E.D. Va. July 30, 2019), *aff'd*, 849 F. App'x 55 (4th Cir. 2021) (internal marks omitted). In *Dress*, the court held that "even if the lost time value of $21 [refunded pre-suit] could qualify as an injury in fact … Plaintiff Dress would not have standing because she has not alleged a concrete, actual, non-hypothetical loss of that time value." *Id.* Indeed, a "bare allegation" of the lost time value of $5 over a two-year period was insufficient to confer standing even where *no* refund had been issued. *Taylor v. Fed. Aviation Admin.*, 351 F. Supp. 3d 97, 103 (D.D.C. 2018); *see also Friedman v. Dollar Thrifty Auto. Grp., Inc.*, 227 F. Supp. 3d 1192, 1203 (D. Colo. 2017) (lost interest on the amount allegedly wrongfully withheld (and repaid) is insufficient injury to establish standing) (citing cases); *Amirhamzeh v. Chase Bank USA, N.A.*, No. CV 13-00527 BRO (FFMx), 2013 WL 7219270, at*4 (C.D. Cal. Oct. 7, 2013) (similar); *Epstein v. JPMorgan Chase & Co.*, No. 13 CIV. 4744 (KPF), 2014 WL 1133567, at *7 (S.D.N.Y. Mar. 21, 2014) (similar). Here, Plaintiff's conclusory allegation that he lost the time value of his funds in the 44 days before the

refund (Am. Compl. ¶ 91) is likewise insufficient to confer standing.

The Court should dismiss all claims for lack of subject-matter jurisdiction.

**II.    The Court Should Dismiss All Counts For Failure To State A Claim.**

To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible only "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court need not accept a complaint's "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement," *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009), or allegations "that contradict matters properly subject to judicial notice or by exhibit," *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002). And "when the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document," courts should credit the document over conflicting allegations. *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 167 (4th Cir. 2016).

**A.    Plaintiff Has No ARS Or UDTPA Claim Because He Has No Injury.**

To have a "right of action" for claims under the ARS and UDTPA, a party must have been "injured … *by reason of* any act or thing done ... in violation of the provisions of this Chapter." N.C. Gen. Stat. § 75–16; *Noble v. Hooters of Greenville (NC), LLC*, 681 S.E.2d 448, 451–52 (N.C. App. 2009) (emphasis added). "[I]n order to determine whether Plaintiffs had standing to bring their UDTPA claim in this case, we must determine whether Plaintiffs' complaint alleged facts sufficient to establish that their injuries were the result of a 'violation' of Chapter 75." *Id*.; *Gray v. N. Carolina Ins. Underwriting Ass'n*, 529 S.E.2d 676, 681 (N.C. 2000). Because Plaintiff has

suffered no injury at all, as discussed above, he cannot have been injured by a violation of the ARS or UDTPA. Accordingly, the Court should dismiss those claims for failure to state claim. *See Noble*, 681 S.E.2d at 451-52; *Gray*, 529 S.E.2d at 681; *Viveros v. Audible, Inc.*, No. C23-cv-0925-JLR, 2023 WL 6960281, at *6 (W.D. Wash. Oct. 20, 2023) (plaintiff "lacks standing" under California auto-renewal statute to sue for allegedly non-compliant cancellation process because she "was able to cancel her Audible Subscription online").

### B. Even If He Has Standing, Plaintiff Has Not Alleged An ARS Violation.

Persons offering automatically renewing contracts must (1) "[d]isclose the automatic renewal clause clearly and conspicuously in the contract or contract offer" and (2) "[d]isclose clearly and conspicuously how to cancel the contract in the initial contract, contract offer, or with delivery of products or services." N.C. Gen. Stat. § 75-41(a). To be "clear and conspicuous" under the ARS, a disclosure need only be "obvious or plainly visible to a person reviewing a contract or contract offer, and not require that person to pore over the text of an agreement to find the particular provision in a sea of text." *Perkins v. New York Times Co.*, No. 22-cv-5202 (PKC), 2023 WL 3601489, at *3-4 (S.D.N.Y. May 23, 2023) (dismissing North Carlina ARS claim in part). The disclosure need *not*: (1) "always include attention-getting attributes such as size, brilliance or contrast'" (2) meet formatting requirements such as "offsetting size, color or font from the surrounding text"; or (3) be close to the "purchase" button on a webpage. *Id.*

### (i) Nord Clearly And Conspicuously Disclosed The Automatic Renewal Terms In Compliance With The ARS (Section (a)(1)).

The ARS requires renewal term disclosures "in the contract *or* contract offer." N.C. Gen. Stat. § 75-41(a) (emphasis added). As long as Nord made the required disclosure in one of those places, it complied with the ARS. *See Grassy Creek Neighborhood All., Inc. v. City of Winston-Salem*, 542 S.E.2d 296, 300 (N.C. App. 2001) ("Where a statute contains two clauses …

connected by the disjunctive (*e.g.*'or')," the statute "will apply to cases falling within either of them." (quoting *Davis v. N.C. Granite,* 131 S.E.2d 335, 337 (N.C. 1963)).  Plaintiff has failed to state a claim under the ARS because, based on his own allegations and evidence that this Court may and should judicially notice, Nord complied with ARS disclosure requirements in both the contract *and* contract offer.

**The Contract**.  At the top of the terms of service, Nord explains, under the bolded "**Subscription**" heading, that: "All our paid Services are provided on a Subscription basis. This means that the provision of the Services will auto-renew at the end of the current Subscription period, unless you cancel it before the auto-renewal."  RJN Exhibit 1 ¶ 1.2.  A bold, underlined hyperlink, "**<u>Subscription Terms</u>**" in the same paragraph links to a summary of key aspects of the subscription, which repeats the disclosure.  *Id.*; RJN Exhibit 2.  The terms of service disclose the renewal terms in paragraphs 3.1-3.2 and 5.3, as well.  RJN Exhibit 1.  Thus, Nord explains the subscription nature of its service and the renewal terms in a manner that is "obvious or plainly visible to a person reviewing a contract" and does not "require that person to pore over the text of an agreement to find the particular provision in a sea of text."  *Perkins,* 2023 WL 3601489 at *2-3; RJN Exhibit 1.

**The Offer**.  Plaintiff's own allegations show that Nord made the required renewal disclosures in its contract offer.  Am. Compl. ¶ 53, 59.  The checkout page where Plaintiff inputted his contact and payment information before enrolling presented the total price with an asterisk.  *Id.* ¶ 53.  The asterisk refers to the following text, on the same page:

> The introductory price is valid for the first term of your subscription.  Then it will be automatically renewed for an additional 1-year term annually and you'll be charged the <u>then-applicable renewal price</u>.  Savings granted by the introductory price are compared to the current renewal price, which is subject to change.  But don't worry — we'll always send you a notification email prior to charging.  <u>Learn more</u>

*Id.*[9]  Once Plaintiff selected a payment method, he was presented with a *second* auto-renewal disclosure, right above the "Continue" button, stating that "[s]ervices are subscription based and will automatically renew until you cancel.  See subscription and cancellations <u>terms</u>."  *Id.* ¶ 59.  From the depiction in the amended complaint, Nord's checkout page "can fairly be characterized as free of visual clutter and containing limited text," as in *Perkins*, 2023 WL 3601489 at *4.  And, as in *Perkins*, "[t]he page includes a short, four-sentence paragraph" including the renewal terms in plain English.  *Id.*  Plaintiff alleges that the disclosures are deficient, because, e.g., the renewal terms are not "in larger type than the surrounding font" and are "colored light gray" and "not set off from the surrounding text."  *Id.* ¶¶ 54-55.  This is irrelevant: unlike other state auto-renewal statutes and subsection (a)(4) of the ARS, which is not at issue, the North Carolina legislature "did not specify a formatting requirement" for the renewal terms, such that formatting allegations cannot support Plaintiff's claim under section (a)(1).  *Perkins*, 2023 WL 3601489 at *4.

### (ii)    *Nord Adequately Disclosed Its Cancellation Terms.*

Plaintiff alleges that Nord's cancellation disclosures violate Section (a)(2) of the ARS.  Am Compl. ¶¶ 107-114.  Here too, Plaintiff fails to state a claim.  Section (a)(2) of the ARS requires sellers to "[d]isclose clearly and conspicuously how to cancel the contract in the initial contract, contract offer, or with delivery of products or services."  As long as Nord made the required disclosure in one of those three places, it has complied with the ARS.  Plaintiff alleges that the contract *offer* does not disclose the cancellation terms.  Am. Compl. ¶ 53-59.  But he ignores that, when he had to select a payment method, a disclosure right above the "Continue" button provided a hyperlink to Nord's "[s]ubscription and cancellation <u>terms</u>" and stated that "[s]ervices are

---

[9] The Complaint includes an image of these terms stretched out to the width of a full browser window and then compressed to an 8.5-inch page, making the text appear artificially small.  Am. Compl. ¶ 53.

14

subscription based and will automatically renew until you cancel." *Id.* ¶ 59. And the contract *itself* discloses not only how and when users may cancel, but that "[c]anceled Subscriptions will *not* be refunded for the unused part of the *ongoing Service period*." RJN Exhibit 1 ¶ 6.7 (emphases added).

Plaintiff also alleges that the cancellation *process* itself was not sufficiently clear. Am. Compl. ¶¶ 69-72. Putting aside that Plaintiff in fact canceled his renewal term with ease *(id.* ¶¶ 81-82), Plaintiff fails to state a claim because the ARS does not address cancellation *processes*.[10] Nor does it require "trial period" or "refund" disclosures. *See* N.C. Gen. Stat. § 75-41.

### C. Plaintiff Has Not Alleged A UDPTA Violation

Claims that sound in fraud, such as those under the UDTPA, must "state with particularity the circumstances constituting fraud." *See Manoula, LLC v. Ohio Sec. Ins.,* No. 1:21-cv-00718, 2022 WL 129322, at *5 (M.D.N.C. Jan. 13, 2022) (citing Fed. R. Civ. P. 9(b) and collecting cases). Allegations must include the "who, what, when, where, and how of the alleged fraud." *Id.* at 6 (internal marks omitted). Here, Plaintiff fails to allege the UDTPA claim under any standard, let alone the heightened pleading standard of Rule 9(b). "[O]nly practices involving 'some type of egregious or aggravating circumstances are sufficient to violate the UDTPA.'" *Belk, Inc. v. Meyer Corp., U.S.*, 679 F.3d 146, 164 (4th Cir. 2012), *as amended* (May 9, 2012). For a UDTPA claim to survive a motion to dismiss, the challenged practice must be deceptive ("capable of or tending to deceive") or unfair ("immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers"). *Waddell v. U.S. Bank Nat'l Ass'n*, 395 F. Supp. 3d 676, 685 (E.D.N.C. 2019). "[A] mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an

---

[10] Plaintiff alleges that Nord "fails to provide written notice that the contract will automatically renew at least 15 days but no earlier than 45 days before the subscription automatically renews" (Am. Compl. ¶ 12), but he does not allege a cause of action under section (a)(3) of the ARS, which governs such notices, presumably because he canceled his renewal subscription approximately two years before any such notice would have been due to him. *Id.* ¶¶ 81-82.

action under the UDTPA." *Foodbuy, LLC v. Gregory Packaging, Inc.*, 987 F.3d 102, 121 (4th Cir. 2021). The only court to have considered ARS-based UDTPA claims dismissed them because "merely alleg[ing] that relevant language was not conspicuously displayed in formats required by the ARS, causing [Plaintiff] to be 'unaware'" of "renewal rate increase[s] ... does not plausibly describe an egregious or aggravating circumstance." *Perkins*, 2023 WL 3601489 at *7-9.

As in *Perkins*, Plaintiff largely relies on alleged violations of the ARS as predicates for his UDTPA claim. Am. Compl. ¶¶ 115-126. But an ARS violation is not automatically a violation of the UDTPA. *Perkins*, 2023 WL 3601489 at *7. Because renewal information required by the ARS was *accessible* to Plaintiff, there is no violation even if, as alleged, the information was not "clear and conspicuous." *Perkins*, 2023 WL 3601489 at *5, 8 (no UDTPA claim where allegations "go toward the formatting of readily available and easily discovered information, and do not describe a deception or the concealment of renewal policies.").

To the extent Plaintiff's UDTPA claim rests on his "trial period" theory and Nord's allegedly deceptive refund disclosures and processes, it still fails. The Court need not credit allegations that are contradicted by documents incorporated in the complaint. *Goines*, 822 F.3d at 167. Plaintiff alleges that he thought he was enrolling in a "trial period," but the checkout page shows clearly that he enrolled in, and paid for, an automatically renewing, two-year subscription with a "30-Day Money Back Guarantee." Am. Compl. ¶ 53. He also immediately received a receipt thanking him for his purchase and showing the payment for a two-year subscription plan—not a "free trial." *Id*. ¶ 67. Indeed, the terms "free trial," "trial period," and "30-day trial" appear nowhere in any of his screenshots. And Plaintiff admits that Nord discloses refund terms and processes under the "30-Day Money-Back Guarantee." Am. Compl. ¶ 63; RJN Exhibit 1 ¶ 6.2-6.3. Those terms specifically state that in order to get a refund, users must not only cancel a subscription, but must "*request a*

*refund within thirty (30) days following [their] purchase of [Nord's] Services.*"  RJN Exhibit 1 ¶

6.2 (emphasis added).  Buying a subscription to an online service with a 30-day right to a refund is

not a "free trial" or "trial period," any more than buying shoes with a right to return them within a

month is.  And Plaintiff admits that he did not ask for a refund until after the 30 days had passed.

Am. Compl. ¶¶ 81-84.

In addition, although Plaintiff alleges that the online cancellation process is "burie[d]" in the

website (Am. Compl. ¶ 70), and that it represents a "dark pattern" (*id*. ¶¶ 40-47), the process even

as he describes it is straightforward: customers "log into their customer account," select "Billing,"

then "Subscriptions" from only *two* options, then "Manage" next to the word "Auto-renewal" and

then "Cancel auto-renewal."  *Id*. ¶¶ 70-71.  That is hardly deceptive and certainly not "unethical"

or "oppressive."  After all, there must be *some* steps involved in canceling a service, and the steps

that Plaintiff alleges are well-labeled and closer to intuitive than to oppressive.  Indeed, it takes only

*four mouse clicks* to *cancel*, according to Plaintiff, but *subscribing* in the first place requires far

greater affirmative interaction: entry of an email address, selection of a payment method, input of

payment information, and a request to complete the purchase.  *Id*. ¶¶ 53, 59.  The Court cannot infer

from the allegations that the cancellation process is deceptive in violation of the UDTPA.

### D.  Plaintiff Fails To State Claims For Conversion Or Unjust Enrichment.

"North Carolina courts have strived to keep tort and contract law (including law related to

warranties) within their separate spheres."  *Kelly v. Georgia-Pac. LLC*, 671 F. Supp. 2d 785, 791

(E.D.N.C. 2009).  "Accordingly, North Carolina courts have developed (and the Fourth Circuit has

applied) the economic loss rule, which prohibits recovery for purely economic loss in tort when a

contract … operates to allocate risk."  *Id.*  Unless a plaintiff alleges personal injury or damage to

property of a third party, disputes arising out of a contractual relationship cannot be tried as torts, subject to limited exceptions not applicable here. *See N. Carolina State Ports Auth. v. Lloyd A. Fry Roofing Co.*, 240 S.E.2d 345, 350 (N.C. 1978). This rule "is based upon broad principles" and is not limited to any type of contract. *Severn Peanut Co. v. Indus. Fumigant Co.*, 807 F.3d 88, 94 (4th Cir. 2015). Plaintiff acknowledges that he entered into a contract with Nord. *See, e.g.*, Am. Compl. ¶¶ 53, 59, 78. Counts III and IV assert common law torts based on the transaction underlying that contract. The economic loss doctrine bars these claims. *See, e.g., N. Carolina State Ports Auth.*, 240 S.E.2d at 350. Because his only conceivable harm could be money lost under a contract—and here Plaintiff was refunded—no exception applies. The Court should dismiss Counts III and IV for this reason alone, and there are additional, independently sufficient reasons to dismiss them as well.

"A tort claim of conversion requires showing some unauthorized act of control over property belonging to another." *United States v. J & E Salvage Co.*, 55 F.3d 985, 989 (4th Cir. 1995); *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 723 S.E.2d 744, 747 (N.C 2012). Here, Plaintiff *authorized* a payment of $131.76 to Nord for a two-year subscription, using a credit card that *he* identified to Nord, for which Nord issued him a receipt. Am. Compl. ¶¶ 53, 67, 79. Plaintiff "voluntarily paid a sum of money pursuant to a contract in exchange for an object of value." *Wooton v. CL, LLC,* No. 2:09-CV-34-FL, 2010 WL 3767308, at *8 (E.D.N.C. Sept. 27, 2010), aff'd, 504 F. App'x 220 (4th Cir. 2013). "Whether the object of value . . . was worth plaintiff's payment is not the subject of an action for conversion." *Id*. Thus, Nord could not have taken "wrongful possession" of the funds that Plaintiff voluntarily transferred to it, under the contract that he admits existed between them. Indeed, Plaintiff would have no claim for conversion even if Nord had *not* refunded Plaintiff's purchase price. *Figueroa v. Point Park Univ.*, 553 F. Supp. 3d 259, 278 (W.D. Pa. 2021) (conversion "inapposite" in claims arising from failure to remit or refund (citing *Metzner v.*

*Quinnipiac Univ.*, 528 F. Supp. 3d 15, 36 (D. Conn. 2021)); *see also Nguyen v. Stephens Inst.*, 529 F. Supp. 3d 1047, 1058 (N.D. Cal. 2021) ("omission to perform a contract obligation is never a tort, unless that omission is also an omission of a legal duty."). The Court should dismiss Count III.

Unjust enrichment is a quasi-contract theory that is available only *when there is no contract*. *McManus v. GMRI, Inc.*, No. 3:12-cv-009-DCK, 2012 WL 2577420, at *10 (W.D.N.C. July 3, 2012) ("[B]ecause all of the facts pleaded by Plaintiff allege the existence and validity of a contract between the parties, Plaintiff's claim for unjust enrichment must fail as a matter of law."); *Booe v. Shadrick*, 369 S.E.2d 554, 556 (N.C. 1988). There is a subscription contract here, and Plaintiff did not plead his unjust enrichment claim in the alternative. Am. Compl. ¶¶ 136-142. Thus, there is no cause of action for unjust enrichment. *Perkins*, 2023 WL 3601489 at *9 (dismissing unjust enrichment claim in ARS context where it was "not pleaded in the alternative and [sought] relief based on activities already governed by contract"). And even if there were no contract, there is still no unjust enrichment, because the doctrine "was devised by equity to exact the return of or payment for, benefit received," and here, Plaintiff admits that the one payment he made to Nord has already been returned to him. *JPMorgan Chase Bank, Nat'l Ass'n v. Browning*, 750 S.E.2d 555, 542 (N.C. App. 2013). The court should dismiss Count IV for failure to state claim.

### III. The Court Should Dismiss All Counts Against The Non-Contracting Defendants For Lack Of Personal Jurisdiction.

Plaintiff bears the burden of establishing personal jurisdiction over non-resident defendants. *Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.*, 334 F.3d 390, 396 (4th Cir. 2003). He must show that: (1) the exercise of jurisdiction must be authorized under the state's long-arm statute; and (2) the exercise of jurisdiction must comport with the due process requirements of the Fourteenth Amendment. *Id*. Because North Carolina's "long-arm statute extends personal jurisdiction to the limits of the Fourteenth Amendment's Due Process Clause, the statutory inquiry

merges with the constitutional inquiry." *DWM Int'l, Inc. v. Cristaux, Inc.*, No. 3:23-cv-00351, 2023 WL 8587271, at *2 (W.D.N.C. Dec. 11, 2023) (J. Bell) (internal marks omitted). Thus, Plaintiff must establish that defendant has "minimum contacts" with the forum such that the assertion of jurisdiction "does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. State of Wash.*, 326 U.S. 310, 316 (1945) (internal marks omitted).

### A. There Is No General Jurisdiction Over Any Defendants.

General jurisdiction over a foreign corporation exists only when its "affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011); *see also Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014). After *Daimler*, a corporation is generally "at home" only where it is incorporated or has its principal place of business. *See Daimler*, 571 U.S. at 127. There is no general jurisdiction over any defendant here because none is incorporated, or has its principal place of business, in North Carolina. Baltramiejuniene Decl. ¶ 3; Sinkeviciene Decl. ¶ 3; Gorelcionkiene Decl. ¶ 3; Kasulis Decl. ¶ 3; Gatsaniuk Decl. ¶ 3. The unsupported allegation that Defendants "conduct substantial business in North Carolina" (Am. Compl. ¶ 19) is not sufficient to establish general jurisdiction. *Lianyungang FirstDart Tackle Co. v. DSM Dyneema B.V.*, 871 F. Supp. 2d 482 (E.D.N.C. 2012)

### B. There Is No Specific Jurisdiction Over The Non-Contracting Defendants.

To establish personal jurisdiction, Plaintiff must allege facts showing that: (1) the defendant purposefully availed itself of the privilege of conducting activities in the forum state; (2) the plaintiff's claims arise out of the activities directed at the forum state; and (3) the exercise of personal jurisdiction would be constitutionally reasonable. *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 278 (4th Cir. 2009). Plaintiff has not met this burden with respect to the Non-

Contracting Defendants.

> **(i)      *Plaintiff Has Alleged No Facts Establishing Purposeful Availment.***

Courts in the Fourth Circuit consider various nonexclusive factors, including:

> (1) whether the defendant maintained offices or agents in the State; (2) whether the defendant maintained property in the State; (3) whether the defendant reached into the State to solicit or initiate business; (4) whether the defendant deliberately engaged in significant or long-term business activities in the State; (5) whether a choice of law clause selects the law of the State; (6) whether the defendant made in-person contact with a resident of the State regarding the business relationship; (7) whether the relevant contracts required performance of duties in the State; and (8) the nature, quality, and extent of the parties' communications about the business being transacted.

*Sneha Media & Ent., LLC v. Associated Broad. Co. P Ltd.*, 911 F.3d 192, 198-99 (4th Cir. 2018)

(citing *Consulting Eng'rs Corp.*, 561 F.3d at 278).

Plaintiff does not allege facts showing that the Non-Contracting Defendants maintained offices, agents, or property in North Carolina; or how the Non-Contracting Defendants reached into North Carolina to solicit or initiate business; or that they deliberately engaged in significant or long-term business activities here; or that they made any in-person contact with any resident of this state. Nor does he allege any communications or contract with the Non-Contracting Defendants.  He relies solely on conclusory allegations that Defendants are alter egos and "have sufficient minimum contacts with this state, and otherwise purposely avail themselves of the privileges of conducting business in North Carolina by marketing and selling products and services in North Carolina."  Am. Compl. ¶ 19.  That is insufficient.  The Non-Contracting Defendants have no employees or agents in North Carolina, and they do not maintain offices or property there.  Sinkeviciene Decl. ¶ 9; Gorelcionkiene Decl. ¶ 9; Kasulis Decl. ¶ 9; Gatsaniuk Decl. ¶ 9.  They do not ship products into North Carolina or market or advertise retail consumer VPN or related services there.  Sinkeviciene Decl. ¶¶ 10-14; Gorelcionkiene Decl. ¶¶ 10-14; Kasulis Decl. ¶¶ 10-11; Gatsaniuk Decl. ¶¶ 10-11.

And Plaintiff's contract is with Nord only. Baltramiejuniene Decl. ¶ 3; RJN Exhibit 1 ¶ 1.4.

Plaintiff has not established purposeful availment by the Non-Contracting Defendants. *See IMO*

*Indus., Inc. v. SEIM s.r.l.*, No. 3:05-cv-420-MU, 2006 WL 3780422, at *1 (W.D.N.C. Dec. 20,

2006) (plaintiff "may not rest on mere allegations where the defendant has countered those

allegations with evidence that the requisite minimum contacts do not exist").

### (ii) *Plaintiff's Claims Do Not Arise From Or Relate To The Non-Contracting Defendants' Contacts With North Carolina, If Any.*

The Non-Contracting Defendants did not enroll Plaintiff in any services, charge him for any

services, or provide any services to him. Sinkeviciene Decl. ¶ 3; Gorelcionkiene Decl. ¶ 3; Kasulis

Decl. ¶ 3; Gatsaniuk Decl. ¶ 3. Thus, even if the Non-Contracting Defendants did have contacts

with North Carolina, there would be no jurisdiction over them because Plaintiff's claims could not

"arise from" those contacts. *See Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124, 132 (4th Cir. 2020);

*White by & through White v. Aetna Life Ins.*, 519 F. Supp. 3d 253 (W.D.N.C. 2021).

### (iii) *Exercise Of Jurisdiction Would Be Unreasonable.*

Without any activity by the Non-Contracting Defendants in North Carolina giving rise to

Plaintiff's claims, the exercise of jurisdiction over them would be unreasonable. *See DP Envtl.*

*Srvs., Inc. v. Bertlesen*, 834 F. Supp. 162, 166-67 (M.D.N.C. 1993) (no jurisdiction where Plaintiff

failed to demonstrate any of the alter ego factors, failed to establish purposeful availment, and

extending jurisdiction would be "fundamentally unfair"). In evaluating whether jurisdiction is

reasonable, the Fourth Circuit considers: (1) the burden on the defendant of litigating in the forum;

(2) the interest of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining

convenient and effective relief; (4) the shared interest of the states in obtaining efficient resolution

of disputes; and (5) the interests of the states in furthering substantive social policies. *Consulting*

*Eng'rs*, 561 F.3d at 278-79. Because they are foreign parties that did not direct any actions at North

Carolina giving rise to Plaintiff's claims, the forum state's interest in adjudicating disputes against the Non-Contracting Defendants is low, and the burden on them of having to defend would be at its maximum. Their absence will not burden Plaintiff, who may proceed against Nord, if he standing and has stated a viable claim (he has not). Because it would be unreasonable for the Court to exercise jurisdiction over the Non-Contracting Defendants, the Court should dismiss.

### C. Defendants Are Not Alter Egos Of Each Other.

Because Plaintiff cannot establish general or specific jurisdiction over the Non-Contracting Defendants, he alleges an alter ego theory, almost entirely on "information and belief." Am. Compl. ¶¶ 25-35. "Application of the [alter ego] doctrine must be exercised reluctantly and cautiously." *Bertlesen*, 834 F. Supp. 162 at 165–66. "[I]t is generally the case that the contacts of a corporate subsidiary cannot impute jurisdiction to its parent entity." *Saudi v. Northrop Grumman Corp.*, 427 F.3d 271, 276 (4th Cir. 2005). Plaintiff must allege facts showing that: (1) one defendant had complete domination over another, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; (2) such control was used to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and (3) the control and breach of duty proximately caused the injury or unjust loss complained of. *Jacobs v. Stein*, No. 3:16-cv-00768-MOC-DSC, 2017 WL 1017125, at *5 (W.D.N.C. Mar. 15, 2017). Factors include gross undercapitalization of the subservient corporation; failure to observe corporate formalities; nonpayment of dividends; siphoning of the corporation's funds by the dominant corporation; non-functioning of officers and directors; absence of corporate records; and whether the corporation is merely a facade for the operation of the dominant stockholder or stockholders. *Id.* at *5. "The burden of establishing a

basis for disregarding a corporate entity and applying the alter ego doctrine rests on the party asserting the claim." *Bertlesen*, 834 F. Supp at 165.

Notwithstanding his advanced notice of Defendants' arguments and the facts in their declarations, Plaintiff "has not articulated with reasonable particularity the requisite disregard of corporate formalities." *See Krausz Indus. Ltd. v. Smith-Blair, Inc*., 188 F. Supp. 3d 545, 557 (E.D.N.C. 2016) (rejecting alter ego jurisdiction). All Defendants observe corporate formalities. Sinkeviciene Decl. ¶¶ 4-8; Gorelcionkiene Decl. ¶¶ 4-8; Kasulis Decl. ¶¶ 4-8; Gatsaniuk Decl. ¶¶ 4-8. They do not comingle funds or lack corporate records. *Id*. They are not mere façades for the operation of Nord, or vice versa. Plaintiff alleges that all Defendants are "closely related in ownership" (Am. Compl. ¶ 33), but even if true, that is insufficient. *See Bertlesen*, 834 F. Supp. at 165-66 ("It is not enough that the stock in two corporations is held by the same individuals and that those two corporations share the same officers and directors.").

The same is true for allegations that Defendants share trademarks or hold themselves out as a single entity in press releases, marketing materials, or online generally. Am. Compl. ¶¶ 25-33; *Corcoran v. CVS Health Corp.*, 169 F. Supp. 3d 970, 984 (N.D. Cal. 2016) (no alter ego even where evidence showed "that CVS Health wholly owns CVS Pharmacy, the two entities have overlapping officers and directors, CVS Health presents itself as one integrated company on its website and in government filings for marketing purposes, and CVS Health has been involved in discrete business decisions of CVS Pharmacy"); *Burnett v. AT&T Inc.*, No. 3:17-CV-741 (DJS), 2018 WL 11206383, at *3 (D. Conn. Mar. 16, 2018) (finding no alter ego relationship between AT&T and AT&T Mobility despite allegations of shared website, trademarks, and brand); *see also Church Ekklasia Sozo Inc. v. CVS Health Corp.*, No. 3:20-cv-00382-RJC-DSC, 2022 WL 1572732, at *3 (W.D.N.C. Feb. 25, 2022) (adopting reasoning of N.D. Cal. decision in dismissing CVS Health, "a holding

company with no operations other than those related to its status as a holding company," for lack of personal jurisdiction defendant); *Moody v. Charming Shoppes of Delaware, Inc.*, No. C 07-06073 MHP, 2008 WL 2128955, at *7 (N.D. Cal. May 20, 2008) ("[g]eneric language on [company's] website and in its press releases simply do not rise to the day-to-day control required to impute the subsidiary's contacts to the parent"); *Payoda, Inc. v. Photon Infotech, Inc.*, 2015 WL 4593911, at *3 (N.D. Cal. July 30, 2015) (website "marketing puffery carries no weight in establishing whether a parent and its subsidiary are in fact alter egos"). !

The Court should dismiss the Non-Contracting Defendants for lack of personal jurisdiction.

## IV.     Amendment Would Be Futile.

Courts should deny leave to amend where amendment would be futile. *Drager v. PLIVA USA, Inc.*, 741 F.3d 470, 474 (4th Cir. 2014). Here, nothing that Plaintiff can allege could change the fundamental fact, straight from Plaintiff's allegations, that he has not been harmed. Accordingly, the Court should dismiss with prejudice and without leave to amend.

## CONCLUSION

Based on these uncurable jurisdictional and pleading defects, Plaintiff's claims should be dismissed, with prejudice and without leave to amend, as to all Defendants.

Dated: August 21, 2024                  Respectfully submitted,

                                        MCGUIREWOODS LLP

                              By:    */s/ Jodie Herrmann Lawson*
                                     Jodie Herrmann Lawson
                                     N.C. State Bar No. 42900
                                     Jessica L. O'Brien
                                     N.C. State Bar No. 56679
                                     201 N. Tryon Street, Suite 3000
                                     Charlotte, NC 28202-2146
                                     Telephone: 704.343.2000
                                     Facsimile: 704.343.2300
                                     Email:   jlawson@mcguirewoods.com

jobrien@mcguirewoods.com

**FENWICK & WEST, LLP**

Jedediah Wakefield
Ethan Thomas
Samuel Sahagian
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone:  415.875.2300
Facsimile:  650.938.5200
Email:        jwakefield@fenwick.com
                 ethomas@fenwick.com
                 ssahagian@fenwick.com

Adam Gahtan
902 Broadway, 18th Floor
New York, NY 10010
Telephone:  212.430.2600
Facsimile:  650.938.5200
Email:        agahtan@fenwick.com

*Counsel for Defendants Nordvpn S.A., Nord*
*Security Inc., NordSec Ltd, NordSec B.V., and*
*Tefincom S.A*

## CERTIFICATE REGARDING USE OF ARTIFICIAL INTELLIGENCE

I certify that: (1) no artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg; and (2) every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

*/s/ Jodie Herrmann Lawson*
Jodie Herrmann Lawson