## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA

DENNIS HANSCOM,

On Behalf of Himself and All Others Similarly
Situated,

**Plaintiff,**

v.

NORDSEC LTD., NORDSEC B.V.,
NORDVPN S.A., NORD SECURITY INC.,
and TEFINCOM S.A. d/b/a NordVPN,

**Defendants.**

Case No. 3:24-cv-00277-KDB-DCK

---

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

---

**WITTELS MCINTURFF PALIKOVIC**

305 BROADWAY, 7TH FLOOR
NEW YORK, NEW YORK 10007
Telephone: (914) 775-8862
Facsimile:  (914) 775-8862
jbm@wittelslaw.com
edr@wittelslaw.com
jlh@wittelslaw.com

**MILBERG COLEMAN BRYSON PHILLIPS
GROSSMAN, PLLC**

900 W. MORGAN STREET
RALEIGH, NORTH CAROLINA 27603
Tel:    919-600-5000
Fax:    919-600-5035
sharris@milberg.com
krobinson@milberg.com

*Counsel for Plaintiff and the Proposed Class*

Dated:  September 18, 2024

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS .................................................................................................... 2

ARGUMENT ........................................................................................................................ 5

    I.    LEGAL STANDARD........................................................................................... 5

    II.   PLAINTIFF SUFFERED A CONCRETE INJURY FROM THE LOST TIME
        VALUE OF THE MONEY THAT DEFENDANTS WRONGFULLY WITHHELD. ..... 5

    III.  THE COMPLAINT'S CAUSES OF ACTION ARE ADEQUATELY PLED. ................ 8

        A.  Plaintiff Was Injured by Nord Security's Deceptive Conduct.................................... 8

        B.  The Complaint Pleads an ARS Violation. .................................................................. 9

            1.  Nord Security Did Not Clearly and Conspicuously Present Its
                Automatic Renewal or Cancellation Terms in the Contract. ........................... 9

            2.  Nord Security Did Not Clearly and Conspicuously Present Its
                Automatic Renewal or Cancellation Terms in the Contract Offer. ................ 11

        C.  The Complaint Pleads UDTPA Violations. ................................................................ 12

            1.  Rule 9(b) Does Not Apply, But the Complaint Nevertheless Pleads
                the Rule 9(b) Factors With Particularity........................................................ 13

            2.  Defendants' Cancellation, Trial, and Refund Practices Violate the
                UDTPA. ......................................................................................................... 14

            3.  Nord Security's Misrepresentations in Connection with Its ARS
                Violations Also Violate the UDTPA. ............................................................ 15

        D.  The Complaint States Claims for Conversion and Unjust Enrichment. ..................... 16

            1.  The Economic Loss Doctrine Does Not Apply Here....................................... 16

            2.  The Complaint States a Conversion Claim..................................................... 17

            3.  Unjust Enrichment Can Proceed in the Alternative........................................ 18

    IV.  PERSONAL JURISDICTION EXISTS FOR ALL DEFENDANTS. ........................... 19

        A.  The Court May Assert Personal Jurisdiction Over the Jurisdictional
           Defendants Due to Their Partnership with NordVPN S.A. in "Nord Security." ........ 20

        B.  The Jurisdictional Defendants Are Alter Egos of NordVPN S.A................................ 23

CONCLUSION.................................................................................................................... 25

Case 3:24-cv-00277-KDB-DCK   Document 59   Filed 09/18/24   Page 3 of 35

# TABLE OF AUTHORITIES

**Cases**

*Amirhamzeh v. Chase Bank USA, N.A.*,
No. 13-cv-00527 (BRO) (FFMx), 2013 WL 7219270 (C.D. Cal. Oct. 7, 2013) ................ 7

*Apex Tool Grp. LLC v. Cyderes, LLC*,
No. 23-cv-00236 (KDB) (SCR), 2023 WL 7490146 (W.D.N.C. Nov. 13, 2023) ....... 17, 19

*Avanti Hearth Prods., LLC v. Janifast, Inc.*,
No. 10-cv-00019 (FDW), 2010 WL 3081371 (W.D.N.C. Aug. 6, 2010) ........ 20, 22, 23, 24

*Bartlett Milling Co. v. Walnut Grove Auction & Realty Co.*,
665 S.E.2d 478 (N.C. App. 2008) ................................................................... 17

*Berman v. Freedom Fin. Network*,
30 F.4th 849 (9th Cir. 2022) ......................................................................... 10

*Booe v. Shadrick*,
369 S.E.2d 554 (N.C. 1988) .......................................................................... 19

*Bybee v. Island Haven, Inc.*,
817 S.E.2d 497 (Table) (N.C. App. 2018) ....................................................... 13

*Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*,
334 F.3d 390 (4th Cir. 2003) .................................................................... 19, 25

*CGM, LLC v. BellSouth Telecomms., Inc.*,
664 F.3d 46 (4th Cir. 2011) ............................................................................ 6

*Church Ekklasia Sozo Inc. v. CVS Health Corp.*,
No. 20-cv-00382 (RJC) (DSC), 2022 WL 1572732 (W.D.N.C. Feb. 25, 2022) .............. 24

*Ciccone v. Cavalry Portfolio Servs., LLC*,
No. 21-cv-2428 (JS) (JMW), 2021 WL 5591725 (E.D.N.Y. Nov. 29, 2021) .................... 8

*Commissariat A L'Energie Atomique v. Chi Mei Optoelectronics Corp.*,
395 F. 3d 1315 (Fed. Cir. 2005) .................................................................... 25

*Cullinane v. Uber Techs., Inc.*,
893 F.3d 53 (1st Cir. 2018) ........................................................................... 10

*Doe v. Obama*,
631 F.3d 157 (4th Cir. 2011) .......................................................................... 8

*DP Env't Servs., Inc. v. Bertlesen*,
834 F. Supp. 162 (M.D.N.C. 1993) ................................................................. 24

*Dress v. Capital One Bank (USA), N.A.*,
No. 19-cv-00343 (LO), 2019 WL 3451304 (E.D. Va. July 30, 2019) ............................ 7

*Ensminger v. Credit L. Ctr., LLC*, No. 19-cv-02147 (TC) (JPO),
2023 WL 6313680 (D. Kan. Sept. 28, 2023) ....................................................... 8

*Epic Tech, LLC v. STHR Grp. LLC*,
   No. 15-cv-00252 (LPA), 2015 WL 8179513 (M.D.N.C. Dec. 7, 2015)............................ 24

*Epstein v. JPMorgan Chase & Co.*,
   No. 13-cv-04744 (KPF), 2014 WL 1133567 (S.D.N.Y. Mar. 21, 2014)........................... 7

*Figueroa v. Point Park Univ.*,
   553 F. Supp. 3d 259 (W.D. Pa. 2021)..................................................................... 18

*Foodbuy, LLC v. Gregory Packaging, Inc.*,
   987 F.3d 102 (4th Cir. 2021) ................................................................. 12, 16, 17

*Freeland v. Findlay's Tall Timbers Distrib. Ctr., LLC*,
   681 F. Supp. 3d 58 (W.D.N.Y. 2023)....................................................................... 8

*Friedman v. Dollar Thrifty Auto. Grp., Inc.*,
   227 F. Supp. 3d 1192 (D. Colo. 2017)...................................................................... 7

*Frost v. AmSafe Com. Prod., Inc.*,
   No. 21-cv-00156 (MOC) (WCM), 2022 WL 826931 (W.D.N.C. Mar. 18, 2022)............ 23

*Gray v. N. Carolina Ins. Underwriting Ass'n*,
   529 S.E.2d 676 (N.C. 2000)................................................................................... 9

*Habitat Educ. Ctr. v. U.S. Forest Serv.*,
   607 F.3d 453 (7th Cir. 2010) ................................................................................ 7

*Hayward Indus., Inc. v. Ningbo C.F. Elec. Tech Co.*,
   No. 20-cv-00710 (FDW) (DSC), 2021 WL 2187953 (W.D.N.C. May 28, 2021)............ 24

*Jahagirdar v. Computer Haus NC, Inc.*,
   No. 20-cv-00033 (MOC) (WCM), 2021 WL 1553820 (W.D.N.C. Apr. 20, 2021) ......... 25

*JPMorgan Chase Bank, Nat'l Ass'n v. Browning*,
   750 S.E.2d 555 (N.C. App. 2013)......................................................................... 19

*Kelly v. Ga.-Pac. LLC*,
   671 F. Supp. 2d 785 (E.D.N.C. 2009) ................................................................... 18

*Keyes L. Firm, LLC v. Napoli Bern Ripka Shkolnik, LLP*,
   No. 19-cv-2173 (AJR), 2022 WL 3099848 (4th Cir. Aug. 4, 2022) ............................ 23

*Krausz Indus. Ltd. v. Smith-Blair, Inc.*,
   188 F. Supp. 3d 545 (E.D.N.C. 2016) ................................................................... 24

*Levy v. Endeavor Air Inc.*,
   638 F. Supp. 3d 324 (E.D.N.Y. 2022) ..................................................................... 8

*Luman v. Theismann*,
   647 Fed. App'x 804 (9th Cir. 2016) ........................................................................ 7

*Manoula, LLC v. Ohio Sec. Ins.*,
   No. 21-cv-00718 (TDS), 2022 WL 129322 (M.D.N.C. Jan. 13, 2022).......................... 13

*McManus v. GMRI, Inc.*,
No. 12-cv-00009 (DCK), 2012 WL 2577420 (W.D.N.C. July 3, 2012) .......................... 19

*Melvin v. Cent. Piedmont Cmty. College*,
No. 24-cv-00491 (KDB) (DCK), 2024 WL 3559603 (W.D.N.C. July 26, 2024) ............. 25

*Metzner v. Quinnipiac Univ.*,
528 F. Supp. 3d 15 (D. Conn. 2021) ................................................................... 18

*MSPA Claims 1, LLC v. Tenet Fla., Inc.*,
918 F.3d 1312 (11th Cir. 2019) ............................................................................ 7

*N. Carolina State Ports Auth. v. Lloyd A. Fry Roofing Co.*,
240 S.E.2d 345 (N.C. 1978) ................................................................................. 18

*Nguyen v. Stephens Inst.*,
529 F. Supp. 3d 1047 (N.D. Cal. 2021) ................................................................ 18

*Noble v. Hooters of Greenville (NC), LLC*,
681 S.E.2d 448 (N.C. App. 2009) .......................................................................... 9

*Pan-Am. Prod. & Holdings, LLC v. R.T.G. Furniture Corp.*,
825 F. Supp. 2d 664 (M.D.N.C. 2011) ................................................................ 23

*Perkins v. New York Times Co.*,
No. 22-cv-05202 (PKC), 2023 WL 3601489 (S.D.N.Y. May 23, 2023) .............. 10, 15, 16

*Pfizer Inc. v. Synthon Holding, B.V.*,
386 F. Supp. 2d 666 (M.D.N.C. 2005) ................................................................ 24

*Pickelsimer v. Pickelsimer*,
127 S.E.2d 557 (N.C. 1962) ................................................................................. 18

*Price v. Greensboro News & Rec., LLC*,
No. 19-cv-00960 (CCE), 2020 WL 586674 (M.D.N.C. Feb. 6, 2020) ......................... 20

*Primerica Life Ins. Co. v. James Massengill & Sons Constr. Co.*,
712 S.E.2d 670 (N.C. App. 2011) ......................................................................... 19

*PTA-FLA, Inc. v. ZTE Corp.*,
715 F. App'x 237 (4th Cir. 2017) .......................................................................... 20

*Puskarich v. Equian, LLC*,
No. 23-cv-3880 (DWD), 2024 WL 2273616 (S.D. Ill. May 20, 2024) ......................... 8

*Renfinity, Inc. v. Jones*,
No. 20-cv-00422 (KDB) (DSC), 2022 WL 1102473 (W.D.N.C. Apr. 13, 2022) ............. 19

*Rhue v. Rhue*,
658 S.E.2d 52 (N.C. App. 2008) ...................................................................... 21, 22

*River's Edge Pharms., LLC v. Gorbec Pharm. Servs., Inc.*,
No. 10-cv-991 (JAB), 2012 WL 1439133 (M.D.N.C. Apr. 25, 2012) ...................... 18, 19

*Roppo v. Travelers Com. Ins. Co.*,
 869 F.3d 568 (7th Cir. 2017) ................................................................. 8

*Rosenthal v. Perkins*,
 257 S.E.2d 63 (N.C. App. 1979)............................................................ 13

*S. Atl. Ltd. P'Ship of Tenn., L.P. v. Riese*,
 284 F.3d 518 (4th Cir. 2002) ................................................................ 14

*Severn Peanut Co., Inc. v. Indus. Fumigant Co.*,
 807 F.3d 88 (4th Cir. 2015) .................................................................. 18

*Silicon Knights, Inc. v. Epic Games Inc.*,
 No. 07-cv-00275 (D) (JEG), 2011 WL 1134453 (E.D.N.C. Jan. 25, 2011) ..................... 17

*Stanford v. Home Depot USA, Inc.*,
 358 F. App'x 816 (9th Cir. 2009) ........................................................... 7

*Taylor v. Fed. Aviation Admin.*,
 351 F. Supp. 3d 97 (D.D.C. 2018)............................................................ 7

*Tejon v. Zeus Networks, LLC*,
 --- F. Supp. 3d ---, 2024 WL 1293757 (S.D. Fla. Mar. 26, 2024) ..................... 10

*Thompson v. United States*,
 No. 23-cv-00149 (KDB) (DCK), 2024 WL 762379 (W.D.N.C. Feb. 23, 2024)................ 5

*TransUnion LLC v. Ramirez*,
 594 U.S. 413 (2021)......................................................................... 8

*Turpin v. Duke Energy Corp.*,
 No. 20-cv-00528 (KDB) (DSC), 2022 WL 287548 (W.D.N.C. Jan. 31, 2022) ................ 5

*U.S. v. J & E Salvage Co.*,
 55 F.3d 985 (4th Cir. 1995) ............................................................... 18

*Van v. LLR, Inc.*,
 962 F.3d 1160 (9th Cir. 2020) ........................................................... 7, 8

*Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*,
 723 S.E.2d 744 (N.C. 2012)............................................................ 17, 18

*Varnell, Struck & Assocs., Inc. v. Lowe's Cos., Inc.*,
 No. 06-cv-00068 (MR), 2008 WL 1745880 (W.D.N.C. Apr. 11, 2008) ..................... 13

*Vigus v. Milton A. Latta & Sons Dairy Farms, Inc.*,
 676 S.E.2d 669 (Table) (N.C. App. 2009)................................................... 17

*Viveros v. Audible, Inc.*,
 No. 23-cv-00925 (JLR), 2023 WL 6960281 (W.D. Wash. Oct. 20, 2023) ................. 8

*Viza Elecs., LLC v. Paradigm Clinical Rsch. Inst.*,
 No. 22-cv-00049 (MOC) (DCK), 2022 WL 4459836 (W.D.N.C. Sept. 23, 2022) ..... 12, 16

*Walker v. Fleetwood Homes of N.C., Inc.*,
   653 S.E.2d 393 (N.C. 2007)..................................................................................... 12

*Walker v. White*,
   609 F. Supp. 2d 529 (W.D.N.C. 2009) ............................................................... 20

*Wall v. Colvard, Inc.*,
   268 N.C. 43 (1966) ............................................................................................. 18

*Wheeler v. BMW of N. Am. LLC*,
   534 F. Supp. 3d 527 (W.D.N.C. 2021) ............................................................... 16

*Wooton v. CL, LLC*,
   No. 09-cv-00034 (FL), 2010 WL 3767308 (E.D.N.C. Sept. 27, 2010),
   *aff'd*, 504 F. App'x 220 (4th Cir. 2013)............................................................ 17

**Statutes**

N.C.G.S. § 75-1.1............................................................................................. 1, 12

N.C.G.S. § 75-41.............................................................................................. *passim*

**Rules**

Fed. R. Civ. P. 12(b)(1)......................................................................................... 6

Fed. R. Civ. P. 12(b)(6)...................................................................................... 5, 6

Fed. R. Civ. P. Rule 9(b)................................................................................ 13, 14

N.C. R. Civ. P. 9(b)............................................................................................. 13

Plaintiff respectfully submits this Memorandum in Opposition to Defendants NordSec Ltd., NordSec B.V., Nordvpn S.A., Nord Security Inc., and Tefincom S.A. d/b/a NordVPN's ("Defendants" or "Nord Security") Motion to Dismiss the Amended Complaint (Doc. No. 54).

## PRELIMINARY STATEMENT

This class action challenges Nord Security's practice of tricking consumers into paying for unwanted subscriptions for internet security services. Am. Compl. ("FAC") ¶ 1, Doc. No. 50. Nord Security misleads consumers into thinking they can easily "try" its services "risk-free" before becoming full-fledged subscribers. *Id.* The truth is, however, that the "risk-free" trial is hard to cancel, and Nord Security's false "risk-free" claims are part of a larger enrollment and cancellation process designed to produce unintended purchases. *Id.*; *see also id.* ¶¶ 7–14 (outlining five Nord Security practices that drive involuntary purchases). Worse, Nord Security's deceptive practices are ongoing even though consumers frequently complain about these abusive tactics directly to Nord Security and on popular consumer complaint websites. *Id.* ¶ 16.

The complaint details ***five*** distinct deceptive and unlawful practices that all Nord Security customers face and explains that consumers need only be tricked by one to be locked into recurring and unwanted subscriptions. *Id.* ¶¶ 7–15. These practices violate North Carolina's Automatic Renewal Statute, N.C.G.S. § 75-41 ("ARS"), North Carolina's Unfair and Deceptive Trade Practices Act, N.C.G.S. § 75-1.1 ("UDTPA"), and the common law. Instead of reforming its conduct and compensating its customers, Nord Security filed the present dismissal motion, primarily relying on jurisdictional arguments that: (1) Plaintiff lacks standing because Nord Security begrudgingly and belatedly provided a refund; and (2) the Court lacks personal jurisdiction over four of the five Defendants that collectively operate as a fictitious company called "Nord Security." Plaintiff, however, suffered a concrete injury from the lost time value of the money Nord Security unlawfully retained. Further, the Court has personal jurisdiction over all

Defendants because "Nord Security's" conduct harmed Plaintiff in North Carolina. Defendants also lodge a scattershot attack at Plaintiff's allegations, including that the ARS does not apply to the practices that harmed Plaintiff and that Defendants' "disclosures" sanitize its trickery. Yet these factual defenses are the stuff of summary judgment and are based on strained readings of the relevant statutes and case law. As explained below, Nord Security's dismissal motion falls far short of the mark and Plaintiff should be allowed to proceed with discovery on his claims.

## STATEMENT OF FACTS

Defendants collectively hold themselves out to the public as a single company called "Nord Security," FAC ¶ 26, offering internet security products and services to consumers in North Carolina and across the United States, *id.* ¶ 26, including a virtual private network ("NordVPN"), a password manager ("NordPass"), and encrypted cloud storage ("NordLocker"), *id.* ¶ 2. But Nord Security deploys at least five deceptive and unlawful tactics designed to trap consumers. *Id.* ¶ 7. As described further below, each tactic is a component of a larger deceptive process that leads to a predictable outcome: saddling customers with subscriptions that they do not want. *Id.*

***First***, Nord Security makes deceptive promises that consumers can "try" its services "risk-free for 30-days" during which consumers can "cancel your subscription and get your money back," rendering the trial "no hassle, no risk." *Id.* ¶¶ 9, 50–52. Instead of offering a free or low-price trial (common in e-commerce), Nord Security instead charges the entire cost upfront when the trial begins, promising a full refund if the user cancels within 30 days. *Id.* ¶ 49. This "risk-free" and "no hassle" trial is an illusion—Nord Security imposes a hidden requirement that customers must cancel, and ***separately and additionally*** request a refund ***after*** canceling. *Id.* ¶ 10.

***Second***, Nord Security's enrollment process fails to make the ARS-required clear and conspicuous autorenewal disclosures. *Id.* ¶¶ 11, 53–56; N.C.G.S. § 75-41(a)(1)–(2). For example, to view the autorenewal terms, consumers must scroll all the way down to the bottom of Nord

Security's payment page and search through fine print. FAC ¶¶ 11, 53. But even that fine print is incomplete. *Id.* ¶ 56. Instead, the key terms are located in two ***other*** documents that contain inconsistent, confusing, and inaccurate statements; the hyperlinks to these fine print documents are hidden. *Id.* ¶ 62. None of this is "clear" or "conspicuous" as required by the ARS.

***Third***, Nord Security's post-enrollment acknowledgement emails fail to inform consumers that to get a refund they must take additional affirmative steps beyond timely canceling the trial. *Id.* ¶ 12. In fact, neither Nord Security's acknowledgement nor receipt email provides any information on cancellation despite its legal obligation to "clearly and conspicuously [disclose] how to cancel the contract." *Id.* ¶¶ 66–68; N.C.G.S. § 75-41(a)(2).

***Fourth***, Nord Security intentionally makes its subscriptions exceedingly difficult to cancel. *Id.* ¶ 13. Without adequate disclosures, consumers must figure out that canceling requires navigating Nord Security's account settings to find a feature buried four layers deep. *Id.* ¶¶ 13, 70. Consumers must access their account and select "Billing" from a long list of options, then figure out how to navigate to the "Subscriptions" tab (which is not clear or conspicuous), then click on "Manage" on a non-conspicuous line pertaining to "Auto-renewal" to finally access a page where they can cancel their account. *Id.* ¶¶ 70–71. Internet design experts call the combination of an easy-to-enroll trial or subscription and an onerous cancellation process a "roach motel." *Id.* ¶ 72.

***Fifth***, Nord Security's unconventional charging practice—extracting future charges 14 days before the subscription period ends—locks consumers into another yearlong subscription well before the first subscription ends. *Id.* ¶ 14.

Further, Nord Security's two supposed "disclosure" documents—the terms of service and subscription terms—do nothing to untangle the deceptive enrollment and cancellation web. In both form and substance, these documents fail to clearly and conspicuously disclose Nord Security's autorenewal terms. In form, the documents are hidden on Nord Security's website, housed in tiny,

inconspicuous hyperlinks in small, light grey font rather than standard hyperlink blue—a design meant to be overlooked. *See id.* ¶¶ 59, 62 (screenshot of payment page). Nor are the terms provided in any other manner before, during, or after enrollment.

If a consumer manages to find the terms of service and subscription terms, the autorenewal provisions are not displayed clearly and conspicuously within these fine-print documents. For example, the autorenewal provisions in the terms of service are not offset from the rest of the 18-page document, bolded, underlined, or in a different color. *See* Doc. No. 56-2. Each provision is buried in the larger document in separate sections. *See id.* at 2–3 (¶ 3, "Subscription and Auto-Renewals"), 3–5 (¶ 5, "Prices and Payments"), 5–6 (¶ 6, "Cancellation and Refund Policy"). The subscription terms are likewise not clear and conspicuous, neither in the presentation of those terms to consumers nor in the document itself. *See* Doc. No. 56-3.

Worse, in substance, the two documents contradict each other and are internally inconsistent. For example, the terms of service's "Auto-Renewal" paragraph states subscriptions will renew "[a]fter the end of your Service period." FAC ¶¶ 64–65; Doc. No. 56-2 ¶ 3.2. Yet the subscription terms state that charges occur "at least 14 days before" the plan expires, FAC ¶ 65; Doc. No. 56-3 at 1, but then inconsistently state elsewhere that the autorenewal charge will occur "[a]fter the end of your initial plan." FAC ¶ 65; Doc. No. 56-3 at 1.

Plaintiff enrolled in Nord Security's "risk-free" 30-day trial period for NordVPN, NordPass, and NordLocker on approximately August 2, 2023. *Id.* ¶¶ 77–78. The same day, Nord Security charged Plaintiff's credit card $131.76. *Id.* ¶ 79. Plaintiff decided to cancel during the trial period and contacted customer service to do so on August 15, 2023. *Id.* ¶¶ 80–81. Plaintiff was told his subscriptions were canceled and he would not be charged unless he resubscribed. *Id.* Plaintiff also received an email confirming the cancellation and assumed he would be timely refunded. *Id.* ¶¶ 82-83. But more than a month later, on approximately September 26, 2023,

Plaintiff learned the refund had not occurred. *Id.* ¶ 85. When Plaintiff contacted Nord Security it claimed he was locked into the subscription because he had only canceled the autorenewal set to trigger after the two-year plan ended. *Id.* ¶ 86. Because Plaintiff had not taken the additional step of affirmatively requesting a refund after canceling the supposedly "risk-free" trial, Nord Security would keep his money. It was only after Plaintiff disputed the charge on his credit card that Nord Security reversed course and refunded him. *Id.* ¶ 87. Plaintiff knows that consumers can only put an end to abusive practices like Nord Security's through a class action. *Id.* ¶ 18. This is both because it makes no financial sense for an individual customer to bring his or her own lawsuit and because many customers do not realize they are victims of Nord Security's unlawful acts. *Id.*

## ARGUMENT

### I.  LEGAL STANDARD.

A Rule 12(b)(1) motion to dismiss addresses whether "the court has subject-matter jurisdiction to hear the dispute." *Thompson v. United States*, No. 23-cv-00149 (KDB) (DCK), 2024 WL 762379, at *1 (W.D.N.C. Feb. 23, 2024) (Bell, J.). "[W]hen a defendant asserts that the complaint fails to allege sufficient facts to support subject matter jurisdiction, the trial court must apply a standard patterned on Rule 12(b)(6) and assume the truthfulness of the facts alleged." *Id.* (citation omitted). In evaluating a Rule 12(b)(6) motion, the court "accepts all well-pled facts as true and draws all reasonable inferences in Plaintiff's favor." *Turpin v. Duke Energy Corp.*, No. 20-cv-00528 (KDB) (DSC), 2022 WL 287548, at *1 (W.D.N.C. Jan. 31, 2022) (Bell, J.).

### II.  PLAINTIFF SUFFERED A CONCRETE INJURY FROM THE LOST TIME VALUE OF THE MONEY THAT DEFENDANTS WRONGFULLY WITHHELD.
*(Responding to Defs.' Point I, Defs.' Br. at 8–11)*

Nord Security wrongfully withheld $131.76 from Plaintiff from August 15, 2023, through September 28, 2023, and he was damaged by the lost time value of those funds. *Id.* ¶¶ 90–91. While small, that injury is both concrete and sufficient to confer Article III standing.

Nord Security makes two arguments for why Plaintiff was not injured. First, Defendants claim the ARS does not apply. Defs.' Mem. in Support of Mot. to Dismiss Pl.'s Am. Compl. at 9, Doc. No. 55 ("Defs.' Br."). Specifically, they claim Plaintiff's subscription did not "renew" because he was charged in full once the 30-day trial began. Defendants are incorrect. Regardless of whether what happened to Plaintiff is a "renewal" under the ARS, the ARS applies where a "contract automatically renews unless the consumer cancels the contract," N.C.G.S. § 75-41(a)—the exact type of contract at issue here.[1] Moreover, Nord Security's ARS defense that Plaintiff was not in a "trial" that renewed into a full-fledged subscription that was difficult to cancel raises factual issues that cannot be decided without discovery. *See* Defs.' Br. at 9. Plaintiff alleges that he signed up for a ***trial*** after seeing the offer to "try" Nord Security with "no risk" for 30 days—an oft- repeated statement. FAC ¶¶ 4–5, 9, 49–52, 80. Nord Security's payment page also emphasizes the 30-day trial with a colorful logo next to the blue "Continue" button consumers click after entering payment details. *Id.* ¶ 59. Further, the complaint alleges the payment timing is part of Nord Security's deceptive web that provokes unintended purchases. FAC ¶¶ 9–10, 15, 73–75. Nord Security uses the "risk-free" trial to lure consumers in, then keeps their money by making canceling autorenewal difficult and requiring an additional undisclosed step of affirmatively requesting a refund. *Id.* ¶¶ 10, 73–75. These allegations, when taken as true as is required at this stage, delineate an ARS-covered "renewal clause" and cancellation process. N.C.G.S. § 75-41(a).

Second, Defendants argue that Plaintiff was not injured because he ultimately obtained a refund—which only occurred ***after*** Plaintiff's credit card company sided with him when he disputed the unlawful charge. Defs.' Br. at 10–11. Nord Security is wrong again.

---

[1] Defendants' statutory standing argument is "distinct from Article III and prudential standing" and is analyzed under Rule 12(b)(6), not 12(b)(1). *CGM, LLC v. BellSouth Telecomms., Inc.*, 664 F.3d 46, 52 (4th Cir. 2011). Regardless, Plaintiff suffered an injury under the ARS. *Infra* pp. 5–8.

Although Nord Security cites cases that purportedly support its claim that time value of money is insufficient to establish standing, all are inapposite.[2, 3] Defendants' brief also omits that the overwhelming majority of courts find that lost time value of money claims confer Article III standing—including the Seventh, Ninth, and Eleventh Circuits. In *Van v. LLR, Inc.*, 962 F.3d 1160, 1161 (9th Cir. 2020), the Ninth Circuit "addressed whether the temporary deprivation of money gives rise to an injury in fact for purposes of Article III standing," ultimately "agree[ing] with other circuits that '[t]he inability to have and use money to which a party is entitled is a concrete injury.'" *Id.* (quoting *MSPA Claims 1, LLC v. Tenet Fla., Inc.*, 918 F.3d 1312, 1318 (11th Cir. 2019)). The Ninth Circuit reasoned that this is a concrete injury "because '[e]very day that a sum of money is wrongfully withheld, its rightful owner loses the time value of the money.'" *Id.* (quoting *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 457 (7th Cir. 2010)). Critically, the plaintiff in *Van*

---

[2] *See Friedman v. Dollar Thrifty Auto. Grp., Inc.*, 227 F. Supp. 3d 1192, 1203 (D. Colo. 2017) (no evidence plaintiff paid charge and plaintiff admitted he received "all that [he] claimed" and was not seeking compensation); *Luman v. Theismann*, 647 Fed. App'x 804 (9th Cir. 2016) (no time value of money allegations); *Epstein v. JPMorgan Chase & Co.*, No. 13-cv-04744 (KPF), 2014 WL 1133567, at *5 (S.D.N.Y. Mar. 21, 2014) (same); *Stanford v. Home Depot USA, Inc.*, 358 F. App'x 816, 817 (9th Cir. 2009) (plaintiff received refund day after purchase and obtained construction permit that was basis of suit). *Taylor v. Fed. Aviation Admin.*, 351 F. Supp. 3d 97, 102–03 (D.D.C. 2018) and *Dress v. Capital One Bank (USA), N.A.*, No. 19-cv-00343 (LO), 2019 WL 3451304, at *3 (E.D. Va. July 30, 2019), both declined to reach whether time value of money was a concrete injury, instead finding allegations regarding the lost time value were insufficiently specific. At most, *Taylor* and *Dress* show that any pleading deficiency is curable via amendment.

[3] Seven years after *Amirhamzeh v. Chase Bank USA, N.A.*, No. 13-cv-00527 (BRO) (FFMx), 2013 WL 7219270 (C.D. Cal. Oct. 7, 2013), the Ninth Circuit held that lost time value of money is a concrete injury, overruling *Amirhamzeh*. *Van v. LLR, Inc.*, 962 F.3d 1312, 1318 (9th Cir. 2020).

suffered a concrete injury even though she also received a ***full refund***. *Id.* at 1162. Plaintiff here

has thus suffered a concrete injury, and this Court has subject-matter jurisdiction.[4, 5]

## III.    THE COMPLAINT'S CAUSES OF ACTION ARE ADEQUATELY PLED.
*(Responding to Defs.' Point II, Defs.' Br. at 11–19)*

### A.    Plaintiff Was Injured by Nord Security's Deceptive Conduct.
*(Responding to Defs.' Point II.A, Defs.' Br. at 11–12)*

As described above, Nord Security's unlawful retention of funds injured Plaintiff. *Supra*

pp. 5–8. Defendants' only automatic renewal case is not to the contrary. There, the court sustained

one plaintiff's autorenewal claim because she was unable to cancel her subscription. *See Viveros*

*v. Audible, Inc.*, No. 23-cv-00925 (JLR), 2023 WL 6960281, at *6–7 (W.D. Wash. Oct. 20, 2023).

Nord Security omits this while emphasizing that the other *Viveros* plaintiff lacked standing because

she successfully canceled. Defs.' Br. at 12. Here, Plaintiff tried to cancel during the trial period,

---

[4] *See also Roppo v. Travelers Com. Ins. Co.*, 869 F.3d 568, 590 (7th Cir. 2017) (injury where delay in settling insurance claim led to lost time value of settlement); *Puskarich v. Equian, LLC*, No. 23-cv-3880 (DWD), 2024 WL 2273616, at *6–7 (S.D. Ill. May 20, 2024) (standing for lost time value of money (collecting cases)); *Levy v. Endeavor Air Inc.*, 638 F. Supp. 3d 324, 329 (E.D.N.Y. 2022) ("Other courts have routinely found that the time value of money is real and concrete, and those courts have therefore found that wrongful deprivation of such time value is a concrete harm." (collecting cases)); *Freeland v. Findlay's Tall Timbers Distrib. Ctr., LLC*, 681 F. Supp. 3d 58, 70–71 (W.D.N.Y. 2023) ("there is agreement among courts in [the Second] Circuit that a plaintiff has alleged an injury-in-fact sufficient to establish standing at the motion to dismiss stage" for lost time value of money (collecting cases)); *Ensminger v. Credit L. Ctr., LLC*, No. 19-cv-02147 (TC) (JPO), 2023 WL 6313680, at *4 (D. Kan. Sept. 28, 2023) ("The lost time value of money, no matter how miniscule, constitutes a concrete injury-in-fact. . . . It is an economic harm, precisely the type of injury long held to be the 'epitome' of concrete." (citations omitted)).

[5] Nord Security's case citations involving allegations of harm via mere statutory violations or speculative future injury are inapposite. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 433–35 (2021) (no injury where parties stipulated credit files containing misleading alerts were not sent to third parties); *Ciccone v. Cavalry Portfolio Servs., LLC*, No. 21-cv-2428 (JS) (JMW), 2021 WL 5591725, at *5 (E.D.N.Y. Nov. 29, 2021) (allegation that debt collection letter was misleading but no allegation of resulting injury); *Doe v. Obama*, 631 F.3d 157, 160 (4th Cir. 2011) (speculative harm to frozen embryos that may have been used for future scientific research).

but Nord Security merely disabled future renewals and kept Plaintiff's money, then refused to refund Plaintiff until he successfully disputed the charge with his bank. FAC ¶¶ 10, 61, 83–87.[6]

**B.    The Complaint Pleads an ARS Violation.**
*(Responding to Defs.' Point II.B, Defs.' Br. at 12–15)*

Companies offering automatically renewing contracts must (1) "[d]isclose the automatic renewal clause clearly and conspicuously in the contract or contract offer;" and (2) "[d]isclose clearly and conspicuously how to cancel the contract in the initial contract, contract offer, or with delivery of products or services." N.C.G.S. § 75-41(a)(1)–(2). An ARS violation "renders the automatic renewal clause void and unenforceable." *Id.* § 75-41(e).

1.    <u>Nord Security Did Not Clearly and Conspicuously Present Its Automatic Renewal or Cancellation Terms in the Contract.</u>
*(Responding to Defs.' Point II.B(i), Defs.' Br. at 12, 14–15)*

Nord Security makes the factual claim that its autorenewal terms were adequately disclosed. Yet this factual assertion cannot be determined on a motion to dismiss, and Defendants' claim is wrong because the supposed "disclosures" are neither clear nor conspicuous. Even if they were, their substance still violates the ARS. In fact, Nord Security's entire defense is based on an effort to sidestep a threshold issue: the documents Defendants rely upon were not ***themselves*** clearly and conspicuously disclosed. A disclosure in a hidden document is no disclosure at all.

Nord Security's terms of service and subscription terms were only provided via "tiny, inconspicuous hyperlinks" in the same small gray lowercase font as the surrounding text rather than the customary bolded blue. FAC ¶ 62; *see also id.* at ¶ 23 (screenshot of deemphasized links). Such hyperlinks are not conspicuous. *See, e.g.*, *Berman v. Freedom Fin. Network*, 30 F.4th 849,

---

[6] Nord Security's other two cases are wholly inapposite. *See Noble v. Hooters of Greenville (NC), LLC*, 681 S.E.2d 448 (N.C. App. 2009) (overserving alcohol and failing to prevent plaintiffs from leaving restaurant was not an unfair or deceptive act that caused impaired driving accident); *Gray v. N. Carolina Ins. Underwriting Ass'n*, 529 S.E.2d 676, 682 (N.C. 2000) (reiterating that violation of insurance statue at issue was violation of the UDTPA as a matter of law).

857 (9th Cir. 2022) ("Customary design elements denoting . . . a hyperlink include the use of a contrasting font color (typically blue) and the use of all capital letters, both of which can alert a user that the particular text differs from other plain text in that it provides a clickable pathway to another webpage. . . . Consumers cannot be required to hover their mouse over otherwise plain-looking text or aimlessly click on words on a page in an effort to 'ferret out hyperlinks.' The failure to clearly denote the hyperlinks here fails our conspicuousness test.") (citations omitted).[7] In short, Nord Security's supposed "disclosures" contained in the terms of service and subscription terms fail because those documents themselves were not clearly and conspicuously disclosed.[8]

Further, even if Nord Security's hyperlinks to its terms of service and subscription terms were clear and conspicuous, the "disclosures" they contain violate the ARS both in form and substance. In form, the terms of service contain a mishmash of "disclosures" scattered across an 18-page document. For example, Nord Security cites six separate provisions in various locations; none are "highlighted" or "stand out from the dense surrounding text." *See* Defs.' Br. at 5–6, 13 (citing ¶¶ 1.2, 3.1, 3.2, 5.3, 6.1, 6.7); Doc. No. 56-2 at 1, 3–7 (cited sections in same style as remainder of document); *see also Perkins v. New York Times Co.*, No. 22-cv-05202 (PKC), 2023 WL 3601489, at *5 (S.D.N.Y. May 23, 2023) (despite hyperlinks to terms in blue boldface, the links were to "a multi-paragraph explanation" where "the methods for cancellation are not highlighted and do not stand out from the dense surrounding text"); *id.* ("a consumer would need to proactively search for [defendant's] policy and scrutinize several blocks of text").

---

[7] *See also Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 63 (1st Cir. 2018) ("gray rectangular box with the language 'Terms of Service & Privacy Policy'" was not conspicuous); *Tejon v. Zeus Networks, LLC*, --- F. Supp. 3d ---, 2024 WL 1293757, at *3 (S.D. Fla. Mar. 26, 2024) ("[T]he hyperlinks and related text are both in light gray font, not blue, and the hyperlinks are underlined but not displayed in all capital letters. Merely underlining the hyperlinks, without more, does not provide sufficient contrast from the other gray font of identical size and capitalization on the webpage . . . .").

[8] In addition, the ARS violations render the contract "void and unenforceable." FAC ¶¶ 111, 140.

In substance, while the terms state that subscriptions will automatically renew, they do not provide key details such as the cost or length of the autorenewal. *See* Doc. No. 56-2 at ¶¶ 1.2, 3.2, 5.3. Likewise, the terms vaguely allude to cancellation (again hidden in dense text) but do not disclose "how to cancel" beyond a general statement that consumers may do so "from your Nord Account," Doc. No. 56-2 at ¶¶ 6.1, 6.7, without further guidance, FAC ¶¶ 69–72. The terms even actively mislead, giving consumers the impression that they will be charged only after a subscription ends rather than 14 days prior to expiration. FAC ¶¶ 64–65. The same is true in the subscription terms. *See* Doc. No. 56-3 (omitting cost and length of autorenewal, how to cancel, and stating subscriptions are renewed "[a]fter the end of your initial plan"). Nord Security violated the ARS by failing to clearly and conspicuously disclose its autorenewal and cancellation terms.

> 2.  <u>Nord Security Did Not Clearly and Conspicuously Present Its Automatic Renewal or Cancellation Terms in the Contract Offer.</u>
> *(Responding to Defs.' Point II.B(i), Defs.' Br. at 13–15)*

Nord Security's contract offer—its website's payment page—also violates the ARS. It does not "clearly and conspicuously" disclose the "automatic renewal clause" or "how to cancel the contract." N.C.G.S. § 75-41(a)(1)–(2). Consumers who want to "try" a Nord Security subscription are sent to its payment page which lacks clear and accurate automatic renewal "disclosures." FAC ¶ 53. Worse, consumers must **scroll down** to the very bottom of the payment page to view this inadequate language. *Id.* Far from clear and conspicuous, this placement is designed to be overlooked. *Id.* ¶¶ 53–54. Moreover, the text is in tiny light gray font rather than a conspicuous color and is not set off from surrounding text in a manner that calls attention to it. *Id.* ¶ 54. Indeed, the payment page is designed to **deemphasize** any "disclosure," by overshadowing it with other elements, including: (1) at least 12 different colors; (2) information in differently sized and colored fonts and in various boxes; (3) hidden hyperlinks; (4) drop-down menus styled as hyperlinks; (5) two callouts for add-on products; and (6) 13 different logos. *Id.* ¶¶ 54, 57. With respect to

cancellation, Nord Security's payment page is silent and contains only a hidden hyperlink to terms which are neither clear nor conspicuous. *Id.* ¶ 59; *supra* pp. 9–10. This too violates the ARS.[9]

### C. The Complaint Pleads UDTPA Violations.
*(Responding to Defs.' Point II.C, Defs.' Br. at 15–17)*

A UDTPA claim requires that the defendant committed an unfair or deceptive act or practice, affecting commerce, that proximately caused injury. *Viza Elecs., LLC v. Paradigm Clinical Rsch. Inst.*, No. 22-cv-00049 (MOC) (DCK), 2022 WL 4459836, at \*6 (W.D.N.C. Sept. 23, 2022). "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. A practice is deceptive if it has the capacity or tendency to deceive." *Walker v. Fleetwood Homes of N.C., Inc.*, 653 S.E.2d 393, 399 (N.C. 2007) (quotation omitted).

Although Nord Security is correct that "a mere breach of contract, even if intentional," cannot sustain a UDTPA claim, Defs.' Br. at 15 (quoting *Foodbuy, LLC v. Gregory Packaging, Inc.*, 987 F.3d 102, 121 (4th Cir. 2021)), "courts have consistently held that a party may demonstrate and prove such a claim in conjunction with a breach of contract claim if it can show substantially aggravating and egregious circumstances attending the breach," *Foodbuy*, 987 F.3d at 121. One such circumstance is "intentional deception for the purpose of continuing to receive the benefits of an agreement." *Id.* Another is "deception either in the formation of the contract or in the circumstances of its breach." *Viza Elecs.*, 2022 WL 4459836, at \*6. Moreover, "[a] party may be guilty of unfair or deceptive acts or practices when it engages in conduct that amounts to an inequitable assertion of its power and position." *Varnell, Struck & Assocs., Inc. v. Lowe's Cos.,*

---

[9] The allegations regarding Nord Security's "roach motel" cancellation process and deficient trial period and refund disclosures address the UDTPA claim, not the ARS claim. *See* FAC ¶¶ 69–72 (citing N.C.G.S. § 75-1.1(a)).

*Inc.*, No. 06-cv-00068 (MR), 2008 WL 1745880, at *7 (W.D.N.C. Apr. 11, 2008) (internal citations omitted). All three of those circumstances are present here.

1. Rule 9(b) Does Not Apply, But the Complaint Nevertheless Pleads the Rule 9(b) Factors With Particularity.

Nord Security is incorrect that UDTPA claims must satisfy Rule 9(b). *See* Defs.' Br. at 15. Indeed, North Carolina courts uphold UDTPA claims even where fraud claims fail to meet North Carolina's Rule of Civil Procedure 9(b). *See, e.g.*, *Bybee v. Island Haven, Inc.*, 817 S.E.2d 497 (Table), at *6 (N.C. App. 2018) ("[F]raud is a separate and distinct legal claim and is not a required element for a [UDTPA] claim."); *Rosenthal v. Perkins*, 257 S.E.2d 63, 67 (N.C. App. 1979) ("[P]roof of fraud would necessarily constitute a violation of the prohibition against unfair and deceptive acts; however, the converse is not always true." (quotation omitted)).

Even if Nord Security were correct (it is not), it conclusorily states that the complaint does not sufficiently plead the UDTPA claim. *See* Defs.' Br. at 15. But the complaint includes the "who, what, when, where, and how." *Id.* (quoting *Manoula, LLC v. Ohio Sec. Ins.*, No. 21-cv-00718 (TDS), 2022 WL 129322, at *6 (M.D.N.C. Jan. 13, 2022). For example:

- ***Who***: Defendants, holding themselves out to the public and operating as a single company called Nord Security. FAC ¶¶ 25–36.

- ***What***: Nord Security uses a multi-pronged web of practices that are designed to trap consumers into making unwanted payments. *Id.* ¶¶ 7–15, 53–76.

- ***Where***: Nord Security conducts its deceptive and unlawful subscription scheme through its website and customer communications. *Id.* ¶¶ 53–76.

- ***When***: Ongoing, and for example, used against Plaintiff in August and September 2023. *Id.* ¶¶ 16–17, 81–87.

- ***Why***: To extract revenue through unintended purchases. *Id.* ¶¶ 7, 15.

- **How**: By making material misrepresentations and omissions in violation of the ARS, UDTPA, and the common law, as alleged in detail. *Id.* ¶¶ 53–76.[10]

    2.    Defendants' Cancellation, Trial, and Refund Practices Violate the UDTPA.

Nord Security makes several unpersuasive arguments that the complaint fails to state a UDTPA claim. First, Defendants claim the complaint does not allege deceptive or unfair conduct. *See* Defs.' Br. at 15. Not so. Nord Security's conduct was deceptive and unfair with respect to "false representations or concealing the true risks of a Nord Security trial or subscription." FAC ¶ 118; *supra* p. 13 (the "What" of Nord Security's scheme); *see also S. Atl. Ltd. P'Ship of Tenn., L.P. v. Riese*, 284 F.3d 518, 541 (4th Cir. 2002) ("As a rule, misrepresentations, even negligent misrepresentations, are sufficient for an act to qualify as an unfair or deceptive trade practice."). The complaint alleges Nord Security's deceptive and unfair conduct is unethical, oppressive, unscrupulous, and injurious to consumers. *See, e.g.*, FAC ¶¶ 7–15, 57, 64–65, 69–76.

Second, Nord Security argues the allegations regarding the trial period and refund practices are contradicted by documents incorporated into the complaint. Defs.' Br. at 16. Defendants are again incorrect. Nord Security plays semantic games regarding the trial period by noting that the terms "free trial," "trial period," and "30-day trial" do not appear in the complaint's screenshots. *Id.* But those screenshots show Nord Security offers consumers the opportunity to "***Try*** NordVPN risk-free for 30 days" during which consumers can "cancel your subscription and get your money back," rendering the trial "no hassle, no risk." FAC ¶¶ 49–52 (emphasis added). Reasonable consumers understand that such statements constitute a trial offer (*see id.* ¶¶ 49–52, 84), and these misrepresentations distinguish Defendants' "buying shoes with a right to return" hypothetical. Defs.' Br. at 17. In any event, this is a merits issue. Nord Security also contradicts itself regarding refunds. Despite telling consumers that during the trial they can "cancel [their] subscription and

---

[10] While it should be unnecessary, Plaintiff is able to amend his complaint to lay out the Rule 9(b) factors with respect to Nord Security's subscription scheme.

get [their] money back" with "no hassle, no risk," Nord Security conceals in fine print that canceling is ***not enough*** and instead a separate and affirmative refund request is needed. FAC ¶¶ 10, 61–63; *see also* Defs.' Br. at 16–17 (citing only the fine print).

Nord Security's "roach motel" cancellation process is likewise deceptive and unfair. Defendants try to brush off the hidden cancellation button by claiming "there must be *some* steps involved in canceling a service" and "it takes only *four mouse clicks to cancel*." Defs.' Br. at 17 (emphasis in original). Nord Security ignores the allegations that there is "no clear path evident" to find the cancellation button—consumers must navigate to "Billing" from a list of nine account page options (reaching this page requires additional steps beyond the "four mouse clicks" Nord Security claims), then a de-emphasized "Subscriptions" tab, then to "Manage" before the customer can finally cancel—none of the steps before "Manage" mention cancellation. FAC ¶¶ 69–72. The process depicted in the complaint is not above board.

Nord Security knows this, which is why its brief abruptly changes argument midstream, claiming it takes "far greater" steps to enroll in a trial than to cancel, Defs.' Br. at 17, while failing to note that under its "mouse clicks" test, a consumer only needs one click on the payment page to sign up. And even taking Nord Security's cancellation claims at face value, consumers still must ferret out the fact that they will not receive a refund unless they explicitly request one.

3.      <u>Nord Security's Misrepresentations in Connection with Its ARS Violations Also Violate the UDTPA.</u>

The complaint alleges misrepresentations in Nord Security's sales pitch, including the terms and operation of the 30-day "risk-free" trial period, the recurring nature of its subscriptions, and its "no hassle" cancellation (and refund). FAC ¶¶ 7–14, 49–51, 73. Yet Nord Security claims that ARS violations do not give rise to a UDTPA claim. Defs.' Br. at 16 (citing *Perkins*, 2023 WL 3601489, at *5, 7–8). *Perkins* does not bear Defendants' weight because there, the complaint did not "identify unethical or oppressive conduct, or describe an inequitable exercise of power" and

"[i]mmoral or inequitable conduct" was only "loosely referenced." 2023 WL 3601489, at *8–9. Here, Plaintiff's complaint outlines Nord Security's unethical, oppressive, and inequitable exercise of power in detail. *See, e.g.*, FAC ¶¶ 7–14 (Nord Security's deceptive web "exploit[s] well-known shortcomings in consumer decision-making"), 16–17 ("Defendants are well aware that their scheme is tricking consumers, as complaints about Nord Security are legion, with hundreds of consumers complaining" yet "Nord Security continues to subject the consuming public to its unlawful subscription scheme"), 41–61 (Nord Security advertises: "Try NordVPN risk-free for 30 days" with "no hassle, no risk," concealing "cancellation during the trial period does not automatically initiate a refund of the consumer's upfront payment as was previously promised").

Moreover, the complaint alleges "intentional deception for the purpose of continuing to receive the benefits of an agreement," *Foodbuy*, 987 F.3d at 121, by "continu[ing] to subject the consuming public to its unlawful subscription scheme" while "continu[ing] to reap significant monetary benefits from it," FAC ¶¶ 16–17, 40, 72. This deception is alleged to be involved in "the formation of the contract," *Viza Elecs.*, 2022 WL 4459836, at *6, including by inducing consumers to enroll with the false promise of a refund if they cancel during the trial, FAC ¶¶ 49–54, 90. Alternatively, because the ARS violations render renewal "void and unenforceable," N.C.G.S. § 75-41(e), there is no contract. Accordingly, the complaint pleads UDTPA violations.

### D. The Complaint States Claims for Conversion and Unjust Enrichment.
*(Responding to Defs.' Point II.D, Defs.' Br. at 17–19)*

#### 1. The Economic Loss Doctrine Does Not Apply Here.

Nord Security argues the economic loss doctrine bars Plaintiff's conversion claim. Defs.' Br. at 17. That doctrine, however, does not bar claims based on an "identifiable" duty "distinct" from a breach of contract. *Wheeler v. BMW of N. Am. LLC*, 534 F. Supp. 3d 527, 534 (W.D.N.C. 2021). Nor does it apply when claims "relate[] to the inducement of the contract rather than claims arising out of the contract itself." *Id.* In fact, as a case Nord Security cites explains: "the North

Carolina Court of Appeals has limited the application of the [economic loss rule] to negligence claims." *Foodbuy*, 987 F.3d at 121.

Here, the ARS and UDTPA provide identifiable and distinct statutory duties Nord Security owed Plaintiff and therefore the economic loss doctrine does not apply. *See, e.g.*, *Vigus v. Milton A. Latta & Sons Dairy Farms, Inc.,* 676 S.E.2d 669 (Table), at *5 n.3 (N.C. App. 2009) (doctrine did not preclude fraud or negligent misrepresentation claims "outside the scope of the contracts involved"); *Silicon Knights, Inc. v. Epic Games Inc.*, No. 07-cv-00275 (D) (JEG), 2011 WL 1134453, at *12 (E.D.N.C. Jan. 25, 2011) (same). The complaint alleges such duties. *See* FAC ¶¶ 54, 68, 110–12 (duties under ARS), 72, 117–18 (duties under UDTPA). And because Nord Security's ARS violations rendered any contract "void and unenforceable," N.C.G.S. § 75-41(e), there is no conflict between contract and tort (nor does the complaint assert breach of contract).[11]

### 2.    The Complaint States a Conversion Claim.

Nord Security invents a new conversion doctrine, asserting that it was not conversion to wrongly keep Plaintiff's money because he paid "voluntarily" and was (eventually) refunded.[12] Defs.' Br. at 18. That is incorrect. "The essence of conversion is not the ***acquisition*** of property by the wrongdoer, but a wrongful ***deprivation*** of it to the owner." *Bartlett Milling Co. v. Walnut Grove Auction & Realty Co.*, 665 S.E.2d 478, 488 (N.C. App. 2008) (emphasis added). There are "two essential elements of a conversion claim: ownership in the plaintiff and wrongful possession or conversion by the defendant." *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 723 S.E.2d 744, 747 (N.C. 2012). The first element is undisputedly met. Nord Security's only

---

[11] Unjust enrichment claims are also not barred by the economic loss doctrine. *See Apex Tool Grp. LLC v. Cyderes, LLC*, No. 23-cv-00236 (KDB) (SCR), 2023 WL 7490146, at *6 (W.D.N.C. Nov. 13, 2023) (Bell, J.) (negligence barred by doctrine, but not unjust enrichment).

[12] Nord Security cites only one case applying North Carolina law supporting its "voluntary payment" claim, but it is inapposite. In that case, a highly risky real estate investment that yielded a lower-than-hoped return was not conversion. *Wooton v. CL, LLC*, No. 09-cv-00034 (FL), 2010 WL 3767308, at *8 (E.D.N.C. Sept. 27, 2010), *aff'd*, 504 F. App'x 220 (4th Cir. 2013).

argument to the second is that Plaintiff has not shown wrongful **_acquisition_**. Defs.' Br. at 18. Again, acquisition is not relevant—deprivation is. Even if it were, Plaintiff did not "voluntarily" pay because he timely canceled his subscription and was owed a refund. FAC ¶¶ 77, 83–84.

Moreover, returning property does not negate conversion. *River's Edge Pharms., LLC v. Gorbec Pharm. Servs., Inc.*, No. 10-cv-991 (JAB), 2012 WL 1439133, at *11 (M.D.N.C. Apr. 25, 2012) ("After an act of conversion has become complete, an offer to return or restore the property by the wrongdoer will not bar the cause of action for conversion." (quoting *Wall v. Colvard, Inc.*, 268 N.C. 43, 49 (1966))). Finally, Nord Security's begrudging refund does not account for the lost time value of money. *See supra* pp. 5–8. The complaint states a conversion claim.[13, 14]

### 3. Unjust Enrichment Can Proceed in the Alternative.

Nord Security argues Plaintiff's unjust enrichment claim should be dismissed because (1) a contract governed, and (2) the claim was not pled in the alternative. Defs.' Br. at 19. Neither argument succeeds. First, the contract on which Nord Security relies is "void and unenforceable." FAC ¶¶ 111, 140; N.C.G.S. § 75-41(e). Longstanding North Carolina law allows unjust enrichment claims in this exact scenario. *See Pickelsimer v. Pickelsimer*, 127 S.E.2d 557, 560 (N.C. 1962) ("implied assumpsit," now unjust enrichment, is the "remedy of the promisee" for a void

---

[13] *U.S. v. J & E Salvage Co.*, 55 F.3d 985 (4th Cir. 1995), *Variety Wholesalers*, 723 S.E.2d 744 (N.C. 2012), and the COVID-19 tuition refund cases *Figueroa v. Point Park Univ.*, 553 F. Supp. 3d 259, 278 (W.D. Pa. 2021), *Metzner v. Quinnipiac Univ.*, 528 F. Supp. 3d 15, 36 (D. Conn. 2021), and *Nguyen v. Stephens Inst.*, 529 F. Supp. 3d 1047, 1058–59 (N.D. Cal. 2021) barred conversion, but **_all_** involved straightforward breach claims styled as conversion—they did not hold that conversion is "inapposite" for "claims arising from failure to remit or refund," but instead that (like here) the claim requires allegations of duties independent from contractual ones.

[14] Nord Security's remaining cases are far afield. In one, an available contractual remedy meant the doctrine barred negligence. *Kelly v. Ga.-Pac. LLC*, 671 F. Supp. 2d 785, 791–96 (E.D.N.C. 2009). And because the court was "sitting in diversity . . . [it] should not create or extend a State's common law or public policy"). Another also barred negligence. *Severn Peanut Co., Inc. v. Indus. Fumigant Co.*, 807 F.3d 88 (4th Cir. 2015). And claiming that a 46-year-old case lists all the doctrine's "limited exception[s]" is purposefully incomplete. *See* Defs.' Br. at 17–18 (citing *N. Carolina State Ports Auth. v. Lloyd A. Fry Roofing Co.*, 240 S.E.2d 345, 350 (N.C. 1978)).

contract).[15, 16] Second, unjust enrichment need not be specifically pled in the alternative. *See* Defs.'

Br. at 19. As this Court has recognized, "the plain language of the [Federal Rules] does not require

an explicit allegation that a claim is being pled in the alternative . . . ." *Renfinity, Inc. v. Jones*, No.

20-cv-00422 (KDB) (DSC), 2022 WL 1102473, at *2–3 (W.D.N.C. Apr. 13, 2022) (Bell, J.); *see*

*also Apex Tool Grp.*, 2023 WL 7490146, at *6 (though plaintiff "has not specifically pled its unjust

enrichment claim in the alternative . . . at this early stage of the case, the Court will allow Plaintiff's

alternative claim for unjust enrichment to proceed . . . .").

## IV. PERSONAL JURISDICTION EXISTS FOR ALL DEFENDANTS.
*(Responding to Defs.' Point III, Defs.' Br. at 19–25)*

NordVPN S.A. concedes the Court has specific jurisdiction over it due to its substantial

contacts with, and purposeful availment of the privileges of doing business in, North Carolina.

Nord Security incorrectly asserts that due to insufficient contacts with North Carolina, the Court

may not assert jurisdiction over the remaining defendants (the "Jurisdictional Defendants"), but

jurisdiction is proper for all Defendants because they are partners and alter egos of NordVPN S.A.

Jurisdiction over a nonresident defendant must (1) "be authorized under the state's long-

arm statute," and (2) "comport with the due process requirements of the Fourteenth Amendment."

*Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003). As

"North Carolina's long-arm statute extends to the limits permissible under the Due Process

Clause," the "single question" is "whether the defendant had certain minimum contacts with the

forum state such that the maintenance of the suit does not offend traditional notions of fair play

---

[15] *See also Primerica Life Ins. Co. v. James Massengill & Sons Constr. Co.*, 712 S.E.2d 670, 679
(N.C. App. 2011) (void contract did not preclude unjust enrichment); *River's Edge Pharms.*, 2012
WL 1439133, at *20 (sustaining unjust enrichment where contract alleged to be unenforceable).

[16] Defendants' cases are inapposite. Unlike in *McManus v. GMRI, Inc.*, No. 12-cv-00009 (DCK),
2012 WL 2577420 (W.D.N.C. July 3, 2012) and *Booe v. Shadrick*, 369 S.E.2d 554 (N.C. 1988),
Plaintiff alleges that any contract is void. FAC ¶¶ 111, 140. In *JPMorgan Chase Bank, Nat'l Ass'n
v. Browning*, 750 S.E.2d 555, 560–61 (N.C. App. 2013), the defendant had no knowledge of the
challenged transaction and therefore could not have been ***unjustly*** enriched.

and substantial justice." *Avanti Hearth Prods., LLC v. Janifast, Inc.*, No. 10-cv-00019 (FDW), 2010 WL 3081371, at *2 (W.D.N.C. Aug. 6, 2010) (cleaned up). "[A] plaintiff only needs to make a *prima facie* showing of personal jurisdiction." *Avanti*, 2010 WL 3081371, at *1. "In deciding whether a plaintiff has made such a showing, the district court must draw all reasonable inferences arising from the proof, and resolve all factual disputes, in the plaintiff's favor." *PTA-FLA, Inc. v. ZTE Corp.*, 715 F. App'x 237, 241 (4th Cir. 2017) (quotation omitted).

Here, this Court has two bases to assert personal jurisdiction over all Defendants. First, all Defendants form a partnership called "Nord Security" with sufficient contacts in North Carolina to grant the Court personal jurisdiction over all the partners. FAC ¶ 26. Second, each Jurisdictional Defendant acts as an alter ego to NordVPN S.A. FAC ¶¶ 32-36. Because Defendants concede that jurisdiction is proper over NordVPN S.A., "the dispositive issue" is whether Plaintiff "has alleged sufficient facts to make a *prima facie* case that [the Jurisdictional Defendants] qualify as either partners or alter egos [of NordVPN S.A.]." *Avanti*, 2010 WL 3081371, at *3.[17]

A.   **The Court May Assert Personal Jurisdiction Over the Jurisdictional Defendants Due to Their Partnership with NordVPN S.A. in "Nord Security."**
     *(Responding to Defs.' Point III.B, Defs.' Br. at 20–23)*

"Where a court has personal jurisdiction over a partnership, either because of the partnership's activities as a whole or the actions of a single partner acting on behalf of the partnership, the court has personal jurisdiction over all of the general partners." *Walker v. White*, 609 F. Supp. 2d 529, 537 (W.D.N.C. 2009).[18] "To prove existence of a partnership, an express

---

[17] Plaintiff does not contend this Court has general jurisdiction over the Jurisdictional Defendants.

[18] *See also Price v. Greensboro News & Rec., LLC*, No. 19-cv-00960 (CCE), 2020 WL 586674, at *4 (M.D.N.C. Feb. 6, 2020) ("[T]he Court may have personal jurisdiction over [one defendant] if it has a partnership with [another defendant] over which the Court has jurisdiction."); *Avanti*, 2010 WL 1081371, at *4 ("[F]or the limited purpose of determining the existence of jurisdiction, this Court finds that it has personal jurisdiction over [one defendant] by virtue of its apparent partnership with [another defendant].").

agreement is not required; the intent of the parties can be inferred by their conduct and an examination of all the circumstances." *Rhue v. Rhue*, 658 S.E.2d 52, 59 (N.C. App. 2008). A partnership exists where persons combine "property, effects, labor, or skill in a common business or venture," agree to "share the profits or losses," and each member acts as "an agent of the others in matters appertaining to the partnership and within the scope of its business." *Id.*

As alleged and shown by the evidence below, there are at least 15 facts establishing that all Defendants operate in this jurisdiction as a partnership called "Nord Security":

(1) Defendants act as a single company called "Nord Security" in such a way that members of the public are unable to identify and distinguish between them. *See* FAC ¶¶ 25, 33; Declaration of Ethan D. Roman, dated Sept. 18, 2024 ("Roman Decl.") ¶ 3.

(2) Defendants' website (www.nordsecurity.com) refers to a single entity, including links for "our products," "our team," and "our values." FAC ¶ 26; Roman Decl. ¶ 4.

(3) Email addresses on Defendants' website use the same "@nordsec.com" domain regardless of which entity employs the employee with the account. Roman Decl. ¶ 5.

(4) Defendants do not market themselves independently, instead marketing themselves collectively as the company "Nord Security." FAC ¶ 33; Roman Decl. ¶ 6.

(5) When consumers navigate to different products offered by Defendants, those products are marketed as belonging to Nord Security. Roman Decl. ¶ 7. For example, the webpage for NordPass boasts in large bold letters "**We belong to the Nord Security Group**," which is described as a single "company" that offers cybersecurity products. *Id.*

(6) After a venture capital firm invested $100 million in Defendants, "Nord Security" issued a press release describing it as an investment in "Nord Security, a global leader in internet privacy and security solutions" rather than an investment in a specific business entity. FAC ¶ 26; Roman Decl. ¶ 8. The press release did not delineate how those funds would be allocated among corporate entities. Roman Decl. ¶ 8.

(7) Defendants issue an annual "Impact Report" to extoll the results of "Nord Security." Roman Decl. ¶ 9. These reports present a single valuation of a unitary company. *Id.* The reports include: (a) the number of employees who "joined Nord Security," (b) the collective valuation of "Nord Security," which includes all business entities without separating between them, (c) the total number of patents Nord Security has, (d) a description of "Nord Security as a great working place," characterizing all employees of any Defendant as an employee of "Nord Security," and (e) a "team of advisors" that advise "Nord Security"— all without disaggregating the various business entities. *Id.* Indeed, the most recent Impact Report refers to all business entities collectively as "the company" at least eight times. *Id.*

(8) Intellectual property of different entities is transferred internally among the partnership. FAC ¶¶ 27–28, 31–32; Roman Decl. ¶ 10. For example, Defendants admit that NordSec Ltd. "once owned the intellectual property of the Nord brand," but state the current owner is NordSec B.V. Defs.' Br. at 7. Moreover, although Tefincom S.A. was the original trademark owner for "NordVPN," FAC ¶ 31, some Nord Security webpages indicate that NordSec B.V. owns the "NordVPN" trademark, while another Nord Security webpage states that "NordVPN is owned and operated by nordvpn S.A." Roman Decl. ¶ 10.

(9) Trademarks owned by one entity are used by other entities in the partnership. FAC ¶¶ 27–28, 31–32; Roman Decl. ¶ 11. For example, Nord Security's webpage indicates that NordSec B.V. owns the intellectual property of the Nord brand, but NordVPN is owned and operated by NordVPN S.A. Roman Decl. ¶ 11.

(10) Nord Security was created by, using their own words, "two best friends" who "sought to create a tool for a safer and more accessible internet." FAC ¶ 32; Roman Decl. ¶ 12.

(11) Those "two best friends" claim on their LinkedIn pages that they are the co-founders of "Nord Security." *Id.*

(12) Defendants market their employees as working for Nord Security. The LinkedIn pages of many of Defendants' employees state those employees work at "Nord Security." Roman Decl. ¶ 13. When a jobseeker visits www.nordvpn.com, the "careers" subpage is on a Nord Security domain (https://nordsecurity.com/careers) that contains various claims and a video about working at "Nord Security." *Id.* Job applicants apply for "Nord Security" positions in Lithuania, Germany, Poland, and remotely. FAC ¶ 33; Roman Decl. ¶ 13. Indeed, Nord Security's website contains a pop-up advertisement to attract employees— "There are a million reasons to join Nord Security." Roman Decl. ¶ 13.

(13) All Defendants' press releases come from "Nord Security" without identifying or distinguishing between corporate entities. FAC ¶ 33; Roman Decl. ¶ 14.

(14) Although Defendants claim that they are discrete entities because they are incorporated in different countries, their website tells a different story, boasting that Nord Security has "a global team working around the world." Roman Decl. ¶ 15.

(15) Defendants are represented by the same counsel. *See Avanti*, 2010 WL 3081371, at *4 ("[T]his Court finds it convincing that Defendants share both employees and counsel . . . to suggest that the two parties qualify as partners."); FAC ¶ 34; Roman Decl. ¶ 16.

These facts show that the Jurisdictional Defendants are NordVPN S.A.'s partners in Nord Security. Nord Security's singular valuation and statement that its capital infusion was into "Nord Security" shows that the partnership shares in profits and losses. *See Rhue*, 658 S.E.2d at 59. All Defendants hold themselves out collectively as "Nord Security;" share intellectual property, a website, an email domain, and counsel; describe employees of each entity as employees of "Nord

Security;" and do not market themselves individually, demonstrating that Nord Security shares "property, effects, labor, or skill in a common business or venture." *Id.* Different products all "belong" to Nord Security, trademarks are used between the companies, and Nord Security issues unitary press releases, meaning "each member [constitutes] an agent of the others in matters appertaining to the partnership and within the scope of its business." *Id.* Because NordVPN S.A.— acting on behalf of Nord Security—has sufficient contacts with North Carolina, the Court has specific jurisdiction over all of NordVPN S.A.'s partners.

## B. The Jurisdictional Defendants Are Alter Egos of NordVPN S.A.
*(Responding to Defs.' Point III.C, Defs.' Br. at 23–25)*

The Jurisdictional Defendants are also alter egos of NordVPN S.A. "When a company is an alter ego of [another], the jurisdictional contacts of the [defendant] are the jurisdictional contacts of the alter ego entity." *Keyes L. Firm, LLC v. Napoli Bern Ripka Shkolnik, LLP*, No. 19-cv-2173 (AJR), 2022 WL 3099848, at *13 (4th Cir. Aug. 4, 2022) (cleaned up). "In evaluating personal jurisdiction, courts will apply and assume to be true an 'alter ego' theory of jurisdiction to parent entities." *Frost v. AmSafe Com. Prod., Inc.*, No. 21-cv-00156 (MOC) (WCM), 2022 WL 826931, at *2 n.3 (W.D.N.C. Mar. 18, 2022). Alter ego status requires: (1) control, meaning "complete domination;" (2) "used by the defendant to" commit unlawful acts; that (3) proximately causes injury. *Avanti*, 2010 WL 3081371, at *4. For jurisdictional purposes, however, the test "is generally recognized to be somewhat less stringent than that necessary to impose liability." *Pan-Am. Prod. & Holdings, LLC v. R.T.G. Furniture Corp.*, 825 F. Supp. 2d 664, 687 (M.D.N.C. 2011) (citation omitted). "North Carolina courts recognize the equitable nature of alter ego theory; as a result, they do not focus on the presence or absence of a particular factor, but instead apply the

doctrine flexibly to avoid injustice." *Avanti*, 2010 WL 3081371, at *5.[19] The same facts demonstrating the Nord Security partnership show the Jurisdictional Defendants are alter egos.

First, the Jurisdictional Defendants have implemented a global business strategy through the fictitious "Nord Security." All Nord Security products and business entities participate in this common venture, and thus same executives control business decisions of the single Nord Security entity. *See Pfizer Inc. v. Synthon Holding, B.V.*, 386 F. Supp. 2d 666, 679 (M.D.N.C. 2005) ("It would be a travesty to allow [defendant] to hold itself out to its shareholders and the public as doing business in North Carolina and, at the same time, selectively avoid process from North Carolina courts at its whim."). Indeed, Nord Security's newly added advisors advise Nord Security generally. Roman Decl. ¶ 9; *see also Pfizer*, 386 F. Supp. 2d at 678 (personal jurisdiction on alter ego theory where affiliates of one defendant shared intellectual property and had common advisors). NordVPN S.A. does not have autonomy to act in ways adverse to the interests of Nord Security, instead acting as an agent of the partnership, with the same executives controlling the partnership and NordVPN S.A., illustrated by all Defendants' representation by the same counsel. *See Hayward Indus., Inc. v. Ningbo C.F. Elec. Tech Co.*, No. 20-cv-00710 (FDW) (DSC), 2021 WL 2187953, at *6 (W.D.N.C. May 28, 2021) ("Notably, one important factor courts generally consider when evaluating jurisdiction under an alter ego theory is whether the defendants alleged to be alter egos share the same counsel.") (collecting cases).[20]

---

[19] Nord Security's out-of-state cases finding no alter ego are irrelevant as the standard turns on the application of North Carolina law. *See* Defs.' Br. at 24–25. Defendants' only North Carolina cases are inapposite. *See Church Ekklasia Sozo Inc. v. CVS Health Corp.*, No. 20-cv-00382 (RJC) (DSC), 2022 WL 1572732, at *3 (W.D.N.C. Feb. 25, 2022) (court did not consider alter ego theory); *Krausz Indus. Ltd. v. Smith-Blair, Inc.*, 188 F. Supp. 3d 545, 557 (E.D.N.C. 2016) (unlike here, plaintiff "made no factual allegations supporting the core requirements and factors pertinent to application of the alter ego theory of personal jurisdiction"); *DP Env't Servs., Inc. v. Bertlesen*, 834 F. Supp. 162, 166 (M.D.N.C. 1993) (no jurisdiction over any defendant).

[20] *See also Epic Tech, LLC v. STHR Grp. LLC*, No. 15-cv-00252 (LPA), 2015 WL 8179513, at *12 (M.D.N.C. Dec. 7, 2015) ("The [defendants'] representation by the same counsel similarly militates towards an alter ego finding.").

Second, because the Nord Security partnership controls all aspects of NordVPN S.A., that partnership—and therefore the Jurisdictional Defendants—committed the conduct challenged here. NordSec B.V. owns the intellectual property involved and NordSec Ltd. previously owned it. FAC ¶¶ 27–28. Tefincom S.A. was the contracting entity for many Class Members. FAC ¶ 31; *see* Defs' Br. at 8 n.8. Nord Security Inc., the only Defendant incorporated in the United States, does not dispute that it offers business products to purchasers in North Carolina. *See* FAC ¶ 30.

Third, the deceptive practices perpetuated by NordVPN S.A. but controlled by the Nord Security partnership proximately caused Plaintiff's and all Class Members' injuries. The business strategy and decisions directed by Nord Security fueled the misrepresentations and unfair and deceptive practices that damaged Plaintiff and the Class. Thus, each member of the Nord Security partnership were alter egos of NordVPN S.A. and this Court has personal jurisdiction over them.[21]

## CONCLUSION

For the reasons stated herein, Plaintiff respectfully requests that this Court deny Defendants' motion.[22]

---

[21] To the extent the Court is not persuaded by Plaintiff's *prima facie* showing of jurisdiction, Plaintiff requests discovery on the issue. The Court has discretion to grant such discovery. *Carefirst of Md.,* 334 F.3d at 396, 402–03. A "plaintiff's right to conduct jurisdictional discovery should be sustained when factual allegations suggest the possible existence of requisite contacts between the defendant and the forum state with reasonable particularity." *Jahagirdar v. Computer Haus NC, Inc.*, No. 20-cv-00033 (MOC) (WCM), 2021 WL 1553820, at *7 (W.D.N.C. Apr. 20, 2021) (quoting *Commissariat A L'Energie Atomique v. Chi Mei Optoelectronics Corp.*, 395 F. 3d 1315, 1323 (Fed. Cir. 2005)). Although Plaintiff has proffered substantial publicly available evidence, limited jurisdictional discovery will likely reveal further facts to support jurisdiction.

[22] As noted above, Plaintiff suffered a concrete injury, but any remaining pleading deficiency can easily be cured. *See supra* p. 7. If the Court rules in favor of Nord Security, Plaintiff should be granted leave to amend. *See Melvin v. Cent. Piedmont Cmty. College*, No. 24-cv-00491 (KDB) (DCK), 2024 WL 3559603, at *1 (W.D.N.C. July 26, 2024) (Bell, J.) (noting "liberal standard" for amending pleadings).

Dated: September 18, 2024
New York, New York

**WITTELS MCINTURFF PALIKOVIC**

/s/ Ethan D. Roman
Ethan D. Roman*
J. Burkett McInturff*
Jessica L. Hunter*
305 BROADWAY, 7TH FLOOR
NEW YORK, NEW YORK 10007
Tel:    (914) 775-8862
Fax:    (914) 775-8862
edr@wittelslaw.com
jbm@wittelslaw.com
jlh@wittelslaw.com

**\*** *Admitted Pro Hac Vice*

**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**

Scott C. Harris
Kathryn Anne B. Robinson
900 W. MORGAN STREET
RALEIGH, NORTH CAROLINA 27603
Tel:    919-600-5000
Fax:    919-600-5035
sharris@milberg.com
krobinson@milberg.com

*Counsel for Plaintiff and the Proposed Class*

## CERTIFICATE REGARDING USE OF ARTIFICIAL INTELLIGENCE

I certify that:

(1) No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

(2) Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

/s/ Ethan D. Roman
Ethan D. Roman